838 A.2d 616

### In re ADOPTION OF S.A.J.

**Appeal of S.S.**

Supreme Court of Pennsylvania.

Argued May 13, 2003.

Decided Dec. 17, 2003.

626

Jon Peter Landis, for Appellant.

Bernard Mendelsohn, Reading, for T.L.D. and B.S.D., Appellees.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice NEWMAN.

In this case, we determine whether the doctrine of judicial estoppel bars the attempts of a putative father to obtain custody of a child and vacate an adoption decree, eleven years after he denied paternity in a support proceeding. For the reasons that follow, we affirm the decision of the Superior Court, which held that the putative father was judicially estopped from making his claim.

## FACTS AND PROCEDURAL HISTORY.

On February 16, 1989, S.A.J. (Child), was born to T.L.D. (Mother), an unmarried woman, who had been sexually involved with two men at the time of conception: S.S., who is the putative father (Appellant), and B.W.[1] Appellant and Mother had never lived together, and by the time of the birth, were no longer involved in a "boyfriend-girlfriend" relation-

---

1. Mother testified that there might have been one other man, as well.

ship. The birth certificate did not name Appellant or B.W. as the natural father.

On May 17, 1989, Appellant filed for partial custody of Child, and Mother admitted that he was the father in her reply. The trial court issued two temporary custody orders by agreement of the parties, granting visitation every other week for two hours. Appellant made the visits for approximately a year.

On February 15, 1990, Mother filed for child support. Pursuant to her Complaint, she and Appellant appeared at a support conference on May 8, 1990. At the conference, Appellant denied paternity in a notarized statement filed in the Domestic Relations Section of the trial court. He indicated: "I ... deny that I am the father of said child. I request trial to determine paternity." On the same day, the trial court issued an Order directing that the case be listed for trial to determine paternity. Reproduced Record of Appellant (RR) at 9.

Appellant did not take further action on that case or obtain a blood or DNA test for paternity determination. Because there was no docket activity, the Prothonotary of Berks County issued a Notice of Termination pursuant to Berks County Rule of Administration 1901 [2] on January 12, 1993, and the court terminated the case on April 19, 1993.

Following the denial of paternity by Appellant, the trial court vacated the visitation privileges by Order of May 10, 1990, and Mother withdrew her Complaint for child support on July 27, 1990. Appellant did not appeal the Order and never requested reconsideration or a further hearing.

For more than eleven years, Appellant did not visit Child or support her. He saw her once at a skating rink and talked

2. Rule 1901 provides for termination of an inactive case in which no docket activity has taken place for a period of 670 days, after 15 days' notice to counsel or to the party if not represented. The notice includes the following: WARNING "The ... case will be subject to termination ... if no docket activity occurs within 60 days after the service of this notice. ... Docket activity within such 60 day period ... or the filing of such motion ... with a request for a hearing will prevent" automatic termination.

with her "off and on" for two hours. In eleven years, he gave her presents on two occasions: gift certificates for Christmas in 2000, which were returned to him, and a gift certificate for her birthday, which she accepted.

In March of 1991, Mother began living with B.D. (Husband) and married him on May 8, 1993. On November 16, 2000, Husband filed a Petition for Adoption with respect to Child, and Mother and B.W., the other potential father, consented. B.W. signed a Consent of the Putative Father of Adoptee, which stated "I understand that I have been identified by [Mother] to be the putative biological father of [Child].... I admit that I have been named as the putative biological father. I further understand that by signing this Consent I do not admit that I am the biological father." RR at 14. Mother was never married to B.W. and never lived with him, although she was having sexual relations with him at the time that Child was conceived. Neither Husband nor Mother identified Appellant in the Petition for Adoption or provided him with notice of Husband's action to adopt Child. In the adoption proceeding, instead of using the attorney Mother used in the 1989 and 1990 support and custody matters, Husband and Mother hired someone else who did not know of the existence of Appellant.

On January 22, 2001, Appellant filed a Complaint for Partial Custody, not knowing that Husband had filed a Petition for Adoption on November 16, 2000. When Appellant learned on February 2, 2001, that the trial court granted a Final Decree approving the adoption of Child by Husband, he filed a Petition to Vacate Judgment on March 8, 2001.

A hearing was held on May 2, 2001 with respect to this Petition. Mother testified that she had been living with Husband since Child was two years old and that she married Husband when Child was four years old. Child had never known a father other than Husband, who helped raise her. Mother and Husband were her sole support. RR at 35. When Appellant denied paternity in 1990, Mother decided to raise Child by herself, and then with the help of Husband.

Child wanted Husband to adopt her and to be part of his family.

Mother testified that when she and Husband hired the adoption attorney, she did not identify Appellant as the natural father, as none was named on the birth certificate, but she told the attorney that B.W. was the father. She said that she did this because she had been having sexual relations with B.W. at the time of conception and because Appellant had denied paternity. She also stated that she obtained the consent of B.W., not Appellant, because "I needed one consent." RR at 34. She stated that she had identified Appellant as the natural father in her Complaint for child support because "he was pursuing me. He took me into court first. I did nothing to take him in except for the support action." RR at 29. At the time of this hearing, Child was twelve years old and living as a family with Mother and Husband. In the ten years that Mother, Husband, and Child were living together, Appellant did not help in any way, visit, provide support, or make any demands to be part of the life of Child.

On June 25, 2001, following the hearing, the trial court granted the Petition to Vacate Judgment. The trial judge, who was the same judge who signed the adoption decree on January 31, 2001, expressed his understandable displeasure that Mother and Husband did not notify Appellant of the proceedings or disclose his existence to the court. Ascribing reprehensible motives to Mother, the trial court issued an Opinion on June 25, 2001, and granted the Petition to Vacate Judgment. The trial court lamented the effect its ruling would have on Child stating, "because of what has happened here, a child's life is once again thrown into chaos.... Once again, the relative innocent is the one who pays the price for the apparent inappropriately expedient behavior of the adults in her life." Opinion of the Trial Court at 13.

On appeal, the Superior Court reversed, determining that Appellant was judicially estopped from challenging the adoption, based on his denial of paternity at the prior child support proceeding and his successful avoidance of paying child support over the entire twelve years of the life of Child. Judge

Cavanaugh issued a dissenting opinion, which asserted that judicial estoppel should not preclude the claim of Appellant. Because Mother herself had unclean hands, as a result of her inconsistent statements, she should not be able to invoke an equitable principle, argued Judge Cavanaugh.

We granted allowance of appeal to consider the interplay between the doctrines of judicial estoppel and unclean hands and to determine whether the earlier denial of paternity should now preclude Appellant from contesting the adoption of Child, where Mother and Husband did not give him notice of the adoption proceedings.

### DISCUSSION

■ We address here the issue of whether the denial of paternity by Appellant in the 1990 support hearing judicially estops him, eleven years later, from vacating a decree allowing the adoption of Child by Husband.

■ Our scope of review with respect to the trial court's grant of the Petition to Vacate Judgment "is limited to determining whether the [trial court's] findings are supported by competent evidence or whether the court abused its discretion or committed an error of law." *In the Matter of the Adoption of Christopher P.*, 480 Pa. 79, 389 A.2d 94, 98 (1978) (internal citations omitted). For the reasons that follow, we conclude that the trial court committed an error of law by not applying judicial estoppel to bar the claims of Appellant.

■ Our Court has defined judicial estoppel and its appropriate application. "As a general rule, a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained." *Trowbridge v. Scranton Artificial Limb Company*, 560 Pa. 640, 747 A.2d 862, 864 (2000) (citing *Associated Hospital Service of Philadelphia v. Pustilnik*, 497 Pa. 221, 439 A.2d 1149, 1151 (1981)).[3]

---

**3.** Whether successful maintenance of the prior inconsistent position of litigant is strictly necessary to implicate judicial estoppel in every case, or whether success should instead be treated as a factor favoring the

In *Trowbridge,* we reviewed the question of whether judicial estoppel barred a claim made by an individual pursuant to the Pennsylvania Human Relations Act (PHRA) that her job termination resulted from illegal discrimination under the PHRA, when she was receiving Social Security disability benefits based on her sworn statement that she was unable to work because of her disabling condition. We reiterated that the purpose of judicial estoppel is "to uphold the integrity of the courts by 'preventing parties from abusing the judicial process by changing positions as the moment requires.'" *Trowbridge* at 865 (quoting *Gross v. City of Pittsburgh,* 686 A.2d 864, 867 (Pa.Cmwlth.1996)). In *Tops Apparel Mfg. Co. v. Rothman,* 430 Pa. 583, 244 A.2d 436 (1968), our Court stated that "[a]dmissions . . . contained in pleadings, stipulations, and the like are usually termed 'judicial admissions' and as such cannot be later contradicted by the party who made them." *Id.* at 438 (internal footnote omitted). In *Tops,* we noted our longstanding reliance on this principle and stated that "[w]hen a man alleges a fact in a court of justice, for his advantage, he shall not be allowed to contradict it afterwards. It is against good morals to permit such double dealing in the administra-

doctrine's application, is the subject of some uncertainty. *See generally* Michael D. Moberly, *Swapping Horses in the Middle of the Stream: A Comparison of the Judicial Estoppel Doctrine in Arizona and Nevada,* 32 Ariz. St. L.J. 233, 254 (2000) (observing that jurisdictions are divided over the "successfully maintained" prerequisite, stating that this is "[p]erhaps the most debated prerequisite to the application of judicial estoppel," and citing cases for both views). While some prior decisions of this Court appear to indicate that it is always a requirement, *see, e.g., Associated Hosp. Svc. of Phila. v. Pustilnik,* 497 Pa. 221, 439 A.2d 1149, 1151 (1981) ("[A]s a general proposition, a party to an action is estopped from assuming a position inconsistent with his assertion in a previous action, if his contention was successfully maintained." (internal quotation marks omitted)), others seem to suggest that a broader application of the doctrine may be appropriate. *See, e.g., Sunbeam Corp. v. Liberty Mut. Ins. Co.,* 566 Pa. 494, 781 A.2d 1189, 1192 (2001) (noting that regulatory estoppel (a form of judicial estoppel) was applicable whether or not the Pennsylvania Insurance Department relied upon the insurance company's prior inconsistent position); *In re Pivirotto's Estate,* 251 Pa. 548, 97 A. 80 (1916) (applying judicial estoppel to the wife of a decedent because she helped her children contest her husband's will, although the will was never avoided). Because we ultimately conclude, *infra,* that Appellant prevailed in the earlier proceedings, we need not definitively resolve this question here.

tion of justice." *Id.* at 438, n. 8 (citing *Wills v. Kane,* 2 Grant 60, 63 (Pa.1853)). "Federal courts have long applied this principle of estoppel where litigants play 'fast and loose' with the courts by switching legal positions to suit their own ends." *Trowbridge* at 865 (quoting *Ligon v. Middletown Area School District,* 136 Pa.Cmwlth. 566, 584 A.2d 376, 380 (1990)).

As in *Trowbridge,* in order to determine if judicial estoppel were appropriately applied by the Superior Court, we must address the following questions: (1) did Appellant assume an "inconsistent" position in 2000 when he claimed he was the natural father, after denying paternity in 1990; and (2) was his contention "successfully maintained?"

With respect to inconsistent statements, in 1990, Appellant denied paternity of Child in a support proceeding in the trial court. Eleven years later, in that same forum, he claimed he was the natural father and filed to vacate the adoption decree that was issued to Husband. There is little doubt that "I am not the father" and "I am the father" are directly opposing statements. However, mere inconsistency is not enough.

In deciding *Trowbridge,* we were guided by a decision of the Supreme Court of the United States in *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), which had decided an analogous issue involving whether an individual's application for, and receipt of, social security disability benefits barred a subsequent lawsuit under the Americans with Disabilities Act of 1990 (ADA). The Supreme Court held that the pursuit and receipt of social security disability benefits did not automatically estop the recipient from pursuing an ADA claim, as there could be situations where someone could be totally disabled for social security purposes and yet could perform essential job functions if "reasonable accommodations" were made. The Court explained that "[a]n SSA representation of total disability differs from a purely factual statement in that it often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.'" *Id.* at 802, 119 S.Ct. 1597. It contrasted this with conflicts arising from statements about "purely factual matters, such as 'The light was red/

green,' or 'I can/cannot raise my arm above my head.' " *Id.* at 802, 119 S.Ct. 1597. The Court noted that where there was an apparent contradiction between the ADA and the disability claims, the "plaintiff cannot simply ignore the apparent contradiction. . . . Rather, she must proffer a sufficient explanation." *Id.* at 806, 119 S.Ct. 1597.

"I am not the father" and "I am the father" are clearly two "directly conflicting statements about purely factual matters," akin to the example cited by the Supreme Court of a green light or a red light. However, as we said in *Trowbridge,* even though Appellant made a plainly inconsistent statement, we are obligated to assess whether he had the opportunity to proffer a sufficient explanation for the contradiction.

In the case *sub judice,* Appellant was permitted to explain his inconsistent statements at the May 2, 2001 hearing on his Petition to Vacate Judgment. His account does not constitute a sufficient explanation for his contradiction. He claimed that he denied paternity on the advice of counsel and to make sure that Child was his. RR at 22, 26.

Despite Appellant's words of explanation, his actions, or, more appropriately, his failure to act during the life of Child over the past twelve years, belie his assertion that he wanted to establish paternity. When he denied paternity, Child was just over one year old. When Appellant filed for partial custody and then to vacate the adoption by Husband, Child was eleven years old. In all that time, he never took a blood test or DNA test to establish paternity. He also never provided support for Child, never played any role in her life, and never made any demands on Mother and Husband to do so. He did not contest the termination of visitation in 1990 and did not pursue his 1990 case for partial custody, which the court terminated in 1993 after issuing a warning and notice to him. The warning and notice clearly advised Appellant that because there had been no docket activity for a period of 670 days, the case would be dismissed unless he took action within 60 days. We conclude that he did not proffer a satisfactory reason to overcome his two inconsistent statements.

■ Next, we review whether his contention was "successfully maintained." In *Trowbridge*, the application for, and receipt of, disability benefits resulted in successful maintenance of the claimant's position. In *Cleveland*, the claimant applied for and received disability benefits, as well. In each case, the individual who made inconsistent statements successfully established her claim and reaped its reward (i.e., payment of benefits). Had either claimant not been awarded benefits, they would not have "successfully maintained" their position for purposes of judicial estoppel. The Supreme Court of the United States in *Cleveland* explained this, stating that "if an individual has merely applied for, but has not been awarded, [disability] benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." *Cleveland* at 805, 119 S.Ct. 1597.

In the instant case, Appellant's denial of paternity, while not resulting in payment of money to him, conferred significant economic advantage on him. The Superior Court correctly determined that "[Appellant's] denial of paternity was successfully maintained by the court, which accepted his denial of paternity and excused him from child support." *In re Adoption of S.A.J.*, 797 A.2d 299, 301 (Pa.Super.2002), *rearg. denied*, May 23, 2002. The trial court accepted his denial in 1990 and proceeded accordingly. It issued two orders: the first in 1990, extinguishing his visitation rights, and the second, in 1993, terminating his custody suit, for his failure to prosecute it for more than four years. Mother, too, acted, withdrawing her support suit, and from then on, Mother supported Child. Appellant, in the twelve years following his denial of paternity, reaped the concomitant benefits: he paid no support and had no responsibility for Child.

■ Having determined that Appellant's actions met the structural criteria for imposing judicial estoppel, we must assess whether they effectuated the harm to be prevented by imposing judicial estoppel: i.e., an abuse of judicial process, resulting in an affront to the integrity of the courts. *Trowbridge* at 865. Appellant has taken liberties with the court system, insulting its integrity. First, he told the court that he

was the father, when he filed for partial custody and visitation in 1989. That court granted him visitation rights because of what he said. Then, he told the same court that he was not the father in 1990, when Mother sought support. On that basis, the court terminated visitation. In 1993, the court gave him another chance to pursue his custody suit, which was dormant since 1990, when it issued a warning and notice that the litigation would be discontinued if no further action were taken. Appellant did not do anything, and the court terminated the litigation.

▇▇▇▇▇ Appellant claims that judicial estoppel does not apply because the issue of paternity was never adjudicated.[4] He ignores the holding of this Court in *Trowbridge* and the Supreme Court of the United States in *Cleveland,* neither of which involved adjudications. Each of those cases addressed the applicability of judicial estoppel to the apparent conflict created between signed applications for disability benefits and discrimination suits under the PHRA and ADA, respectively.[5]

Appellant believes that the Superior Court opinion in *Ham v. Gouge,* 214 Pa.Super. 423, 257 A.2d 650 (1969), supports his argument that judicial estoppel requires an adjudication of paternity. Although the court in *Ham* discussed the principle of estoppel, it did not address *judicial estoppel.*

Appellant's assertion that the Superior Court erred in finding him judicially estopped from claiming fatherhood strains

---

**4.** It would appear that he has confused the doctrine of judicial estoppel with collateral estoppel.

Collateral estoppel is used to protect the finality of judgments and to conserve judicial resources ... whereas judicial estoppel is concerned solely with protecting the integrity of the courts.... And though collateral estoppel may not be employed unless the underlying issue was actually litigated ... there is no such requirement for the use of judicial estoppel.

*Montrose Medical Group Participating Savings Plan v. Bulger,* 243 F.3d 773, 779, n. 3 (3d Cir.2001) (internal citations omitted).

**5.** In each of these cases, the Courts looked at the conflicts that arose from sworn statements made as part of the disability application process. These statements, which lead to the granting of benefits, are analogous to Appellant's notarized execution of denial of paternity, filed with the trial court.

belief. It was up to him to prove his status of paternity through blood or DNA testing, and he chose not to do that. He never pursued the custody case he filed in 1990. He never requested the court to order blood tests pursuant to the Uniform Act on Blood Tests to Determine Paternity, 23 Pa.C.S. § 5104.[6] He never requested the court or the Domestic Relations Section to obtain a genetic test to establish paternity. 23 Pa.C.S. § 4343(a), (c).[7]

■ Although Appellant did not undertake actions of his own to establish paternity, because paternity is such an important question, we feel compelled to determine whether there is any other justification for his claim. In *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380, 1383, n. 2 (1990), we cited Pennsylvania statutory law, which provides that:

For purposes of descent by, from and through a person born out of wedlock, he shall be considered the child of his father when the identity of the father has been determined in any one of the following ways:

(1) If the parents of a child born out of wedlock shall have married each other.

(2) If during the lifetime of the child, the father openly holds out the child to be his and provides support for the child which shall be determined by clear and convincing evidence.

6. Section 5104(c) provides that in matters in which paternity is a relevant fact, "the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or ... shall order the mother, child and alleged father to submit to blood tests."

7. Section 4343(a) provides that
[w]here the paternity of a child born out of wedlock is disputed, the determination of paternity shall be made by the court in a civil action without a jury. A putative father may not be prohibited from initiating a civil action to establish paternity....
Section 4343(c)(1) provides that
Upon the request of any party to an action to establish paternity ... the court or domestic relations section shall require the child and the parties to submit to genetic tests.

(3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.

20 Pa.C.S. § 2107(c). The statute requires "clear and convincing evidence" of support and of paternity. In the case of Appellant, he provided none, and he therefore fails to meet the definition of father under any of those three criteria.

Although the facts in *John M.* involved a challenge by a putative father to the paternity of a child born to a married woman, we stressed that:

There are other interests at stake ... besides those of ... husband and ... father. Obviously, the needs and interests of the Child are of paramount concern and the needs and interests of ... wife/mother are on a par with the "putative" and "presumptive" fathers. There is, in short, a family involved here. A woman and a man who have married and lived together as husband and wife, giving birth to and raising four children, have obvious interests in protecting their family from the unwanted intrusions of outsiders (even ones who have had serious relationships with the mother, father or children).

*Id.* at 1386. The needs of Child in the instant case are our "paramount concern." She has known only Husband as her father for the past ten years of her life. Although Husband did not adopt Child until 2000, he had lived with her since she was two, and in those ten years, Appellant never opposed that living arrangement or tried to change it in any way.

The parental obligation "is a positive duty and requires affirmative performance." *Petition of Lutheran Children and Family Service of Eastern Pennsylvania*, 456 Pa. 429, 321 A.2d 618, 620 (1974) (quoting *Smith Adoption Case*, 412 Pa. 501, 194 A.2d 919, 922 (1963)). In that case, we affirmed the termination of parental rights of a mother where she did not provide care, control and subsistence for her child. If the rights of a biological mother can be taken away for lack of affirmative actions to care for her child, surely a putative father cannot establish paternity when he has failed to per-

form any of those same duties of support and care for Child over the course of her entire life. If this Court were to permit Appellant to vacate the adoption decree, the stable family situation that Child has experienced over the past twelve years would come to a halt, to the detriment of Child. Given the absence of Appellant from the life of Child, and his complete failure to take any dispositive action to establish paternity after he denied it, we believe that no other remedy is adequate.

 There is another consideration we address, not specifically referred to by the Superior Court in its Opinion, but inherent in its reasoning. In addition to being *judicially* estopped, Appellant is also *equitably* estopped from vacating the adoption decree. "Equitable estoppel . . . refers to estoppel created by a party's conduct and has nothing to do with a prior judicial determination." *Everett v. Anglemeyer*, 425 Pa.Super. 587, 625 A.2d 1252, 1255 (1993) (quoting *Gulla v. Fitzpatrick*, 408 Pa.Super. 269, 596 A.2d 851, 857, n. 2 (1991)). Although estoppel has been applied most frequently to prevent fathers from *denying* paternity when they have acted as fathers in the lives of their children, the doctrine applies equally to the instant situation where Appellant denied his paternity, never held himself out to be father, and never took responsibility, financial or otherwise, for Child. We have noted that:

> [e]stoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage. . . . [T]he doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, *both* mother and father, to their prior conduct regarding the paternity of the child."

*Freedman v. McCandless*, 539 Pa. 584, 654 A.2d 529, 532–533 (1995) (internal citation omitted) (emphasis in original). Appellant has been absent from Child's life over the course of her twelve years. Mother and Husband have taken the entire responsibility for Child. Appellant is equitably estopped from

undoing the situation that he created, by his words and by his failure to act.

We recognize the issue that Judge Cavanaugh raised *sua sponte* in his dissent that "[a] basic tenet of equity is that the party who seeks to invoke it, must have clean hands. 'The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy at issue.'" *Adoption of S.A.J.* at 302 (quoting *Terraciano v. Commonwealth, Dept. of Transportation,* 562 Pa. 60, 753 A.2d 233, 237–238 (2000)). While it is true that Mother made inconsistent statements about the paternity of Appellant, the fact is that paternity *is* unknown, given the potential of two, and possibly three, different fathers. Mother identified Appellant as father and sought support only after he sued for custody. When he denied paternity, she dropped the suit.

We concur with the interpretation of the majority of the Superior Court that "Mother and Husband, acting under the reasonable belief that [Appellant] had officially renounced his claim to [Child] by denying paternity at the support hearing, had the only other potential father, B.W., consent to the Petition for Adoption." *Id.* at 301. There is no evidence that their failure to obtain the consent of Appellant constituted "fraud or deceit," so as to bar judicial estoppel for violation of the clean hands doctrine. *In re Estate of Pedrick,* 505 Pa. 530, 482 A.2d 215, 222 (1984) (internal citations omitted).

Appellant contends that the issue before the Court is whether he was entitled to notice as a putative father in the adoption hearing. Pursuant to the Adoption Act, the consent of parents of a child under 18 is required, unless parental rights are terminated. 23 Pa.C.S. §§ 2711(a)(3), 2714. Notice of the proceeding is to be given only to those persons whose consents are required and to such other persons as the court directs. 23 Pa.C.S. § 2721. Appellant asserted in a court proceeding that he was not the father of Child. Mother's explanation as to why she obtained B.W.'s consent and not Appellant's is logical. While Appellant argues that the court would have directed that notice be given to him if Mother and Husband

had disclosed his existence, this is conjecture, and Appellant cannot be heard to complain when Mother took him at his word.[8]

While Mother and Husband should have traveled the higher road by disclosing the prior custody action of Appellant, the record demonstrates that their *actions* with respect to raising and supporting Child and providing her with a stable home for her entire life, significantly tip the scales of equity in their favor.

Appellant has used only *words* to establish his case, and his words have been inconsistent: "I deny paternity." "I am the natural father." His *actions*, however, have been entirely consistent over the past twelve years with respect to Child; he has virtually ignored her.

## CONCLUSION

In this case, the consistent actions of Mother and Husband in raising Child speak louder than the contradictory statements of Appellant. Given these particular facts, we are

**8.** The dissent would affirm the decision of the trial court to vacate the adoption decree because of the lack of notice, agreeing with the inference by the trial court that Mother and Husband, in hiring a different attorney for the adoption proceedings, did so to deceive the court regarding Appellant's existence. While we are troubled by the lack of notice, our view of the record is different, because there was no evidence to support the court's inference of manipulation and deception.

In no way should our decision be read as condoning the failure to provide required notice to parties to an adoption. If we were able to rewrite history and undo the passage of twelve years in the life of Child, we would construct a more perfect scenario, where Appellant did receive notice. Our charge, however, is more limited, and we must make our determinations based on the reality of the situation as it exists.

In this case, we are required to weigh and measure the complex circumstances before us, which involve factors more subtle and less tangible than the lack of notice. These include Appellant's history of denying paternity and total lack of involvement in Child's life, Child's stable family situation with Mother and Husband, the only person she has known as father since she was two years old, and the harm that would be visited upon Child should this Court impose another disruption in her life. We reach our determination based only on these particular circumstances.

unwilling to disrupt the life of Child any further. We find that Appellant is judicially estopped by his words and equitably estopped by his conduct from interfering with Child's historically stable family situation. The Order of the Superior Court is affirmed.

Justice LAMB files a dissenting opinion.

Justice LAMB dissenting.

I am compelled to disagree with the result reached by the majority affirming the Superior Court's reversal of the trial court's order to vacate. For the reasons explained below, I would affirm the trial court's decision to vacate its adoption decree because of the lack of notice.

It is first necessary to review the facts that led the trial court to vacate its adoption decree. Mother's husband (Husband) filed a petition seeking to adopt S.A.J. on November 16, 2000. Attached to the petition for adoption was Mother's consent to the adoption along with B.W.'s consent to the adoption, in which B.W. stated that he had been named by Mother as the biological father, suggesting to the court that he was the biological father of S.A.J. In fact, the petition for adoption, which was verified by Husband, read as follows: "The natural father of said child is [B.W.]. He has had no contact with the child. He has not paid any financial support for the child. He has signed a Consent to give up his rights to said child. This Consent is attached. . . ." Trial Ct. slip op. at 5. (citing Petition for Adoption, Paragraph 9). Relying on B.W.'s consent, the trial court signed the proposed adoption decree. Upon the filing of Appellant's Petition to Vacate, the trial court determined that Appellant had been previously named as the father of the child by Mother in a 1990 support action and that Mother had admitted that Appellant was S.A.J.'s father in a 1989 custody action filed by Appellant. The trial court noted that Appellant "was not named, mentioned, or served with any notice of the termination of parental rights proceeding or the adoption proceeding." Trial Ct. slip

op. at 3.[1] Further, the trial court noted that Mother hired an attorney different from the one who represented her in the custody and support actions in 1989 and 1990. *Id.* at 9. The trial court concluded that Mother's selection of new counsel was motivated by a desire to conceal from the court her prior assertion of Appellant's paternity, and possibly even his existence as a putative father. *Id.* at 11–12. Mother could not utilize the attorney who knew Appellant was a putative father if she was to avoid apprising the court of Appellant's existence. *Id.* In the view of the trial court, Mother and Husband deliberately concealed Appellant's existence and named a putative father who would consent to termination of his alleged parental rights in order to allow the adoption to proceed. *Id.* at 12. Apparently, Mother and Husband decided that it was acceptable to leave Appellant out of the proceedings.

The majority opinion states:

We concur with the interpretation of the majority of the Superior Court that "Mother and Husband, acting under the reasonable belief that [Appellant] had officially renounced his claim to [Child] by denying paternity at the support hearing, had the only other potential father, B.W., consent to the Petition for Adoption."

. . . Mother's explanation as to why she obtained B.W.'s consent and not Appellant's is logical. While Appellant argues that the court would have directed that notice be given to him if Mother and Husband had disclosed his existence, this is conjecture, and Appellant cannot be heard to complain when Mother took him at his word.

Majority op. at 640–41, 838 A.2d at 625–26.

I respectfully disagree. The process of drawing inferences from the facts before it was the unique province of the trial court, which concluded that Mother's action in using a differ-

1. The adoption decree was based on B.W.'s consent since the trial court believed him to be the biological father of S.A.J. The trial court's act in vacating the adoption decree is, I believe, effective as a *sua sponte* order, regardless of whether S.S. had the procedural right to challenge the decree, because the trial court discovered that there may be a biological father whose parental rights have not been terminated.

ent attorney evidenced her intent to purposefully avoid informing the court about Appellant's existence. In the instant case, the termination of the alleged biological father's parental rights, and ultimately the adoption, were based on the consent of B.W., without any notice to Appellant, whose existence, because of Mother and Husband's deception, was never revealed to the trial court. The trial court thus concluded that:

the biological mother and adoptive father took pains to conceal such information from this Court, and from the man who it appears is the biological father of this child.

It should be clear that the issue before this Court is not the worthiness of [Appellant] as the father. [Appellant] may, in the end, prove to be unworthy of having a relationship with this child, but, properly done, he would have had his day in court in a termination proceeding. Not ever having been given that opportunity, his rights were denied him. He was thwarted all opportunity to present his side of the case and thus the Court has no option but to vacate its judgment.

Trial Ct. slip op. at 13. This language contradicts the majority's claim that Appellant's argument, that the court would have directed that notice be given to him if Mother and Husband had disclosed his existence, is conjecture. *See* quote from majority opinion, *supra*, p. 627–29, 838 A.2d p. 618.

Additionally, Mother also failed to tell the court about the existence of a third man who could possibly be the biological father of S.A.J. Mother and Husband desired to proceed with the adoption without Appellant's interference. Nonetheless, the notice requirements in this convoluted scenario are not a matter of convenience for Mother and Husband. The trial court concluded that Appellant's failure to receive notice deprived him of constitutional and statutory rights. Trial Ct. slip op. at 3–5. As the majority states: "Pursuant to the Adoption Act, the consent of parents of a child under 18 is required, unless parental rights are terminated." 23 Pa.C.S. §§ 2711(a)(3), 2714. Majority op. at 640–41, 838 A.2d at 626.[2]

---

**2.** Additionally, I note that an adoption can not take place unless the rights of the biological father have been terminated, either by consent or by involuntarily termination. In fact, the Adoption Act was amended

Therefore, the court would have to determine that his parental rights had been terminated prior to the adoption. The effect of the decision today would appear to be to empower one party to the matter, here the Mother and Husband, to decide in advance of the judicial proceedings that another party with a potential interest is undeserving of notice or an opportunity to be heard. I would not interfere with the fact-finding function of the trial court, which found that Mother and Husband deceived the court with the result of depriving Appellant of the notice and opportunity to be heard. The trial court was legitimately concerned that if Appellant turned out to be the biological father, the adoption would be subject to challenge. In my view, the trial court's response to these difficult and complex facts was reasonable and well within its sound discretion.

Additionally, in concluding that Appellant is judicially estopped from challenging the adoption decree, the majority relies, in large part, on Appellant's denial of paternity. However, the majority does not discuss the circumstances of said denial as found by the trial court:

[Appellant] testified that he availed himself of the limited visitation granted in [the July 21, 1989, and April 27, 1990] custody orders [3], and Mother's testimony did not contradict [this]. The visitation came to an unusual end shortly following Mother's filing of her petition for child support. At the

in order to conform to this Courts decision in *Adoption of Walker*, 468 Pa. 165, 360 A.2d 603 (1976), which held that the former provision requiring only the consent of the mother of an illegitimate child for adoption was unconstitutional. The Adoption Act, 23 Pa.C.S. 2101 et seq., governs not only adoptions, but also, *inter alia*, proceedings prior to the petition to adopt. Included in the proceedings prior to the petition to adopt is the involuntary termination of parental rights. 23 Pa.C.S. §§ 2511–2513. The instant case required such termination or consent from Appellant. *Cf.* Trial Ct. slip. op. at 13 (finding that Appellant was entitled to a termination proceeding).

3. "[W]hen [Appellant] filed a complaint for custody of the minor child on May 17, 1989 asserting ... that he was the father of the minor child, Mother in her reply admitted ... the assertion that [Appellant] was the father of the minor child. In fact, two custody orders were entered by agreement of the parties, dated July 21, 1989, and April 27, 1990, providing [Appellant] with limited visitation with this very young infant." Trial Ct. slip op. at 6.

conference held on May 8, 1990[, Appellant] had denied paternity and requested a blood test. [Appellant] testified that he would gladly have paid support if the child was his; however, he testified, after the birth of the minor child Mother had made several comments to [him] intimating that he might not be the biological father of the child. Because of Mother's statements, [Appellant] testified, he was in doubt enough to request, through counsel, a blood test to determine paternity. (As a practical matter the only way for a doubting father to obtain a court order for blood tests from the Domestic Relations Office of Berks County is to deny paternity.)

Trial Ct. slip op. at 6 (footnote added). During her testimony, Mother denied that she suggested to Appellant that he was not the father. But Mother also testified that she had sexual relations with B.W. around the time of the conception of S.A.J., and that the biological father could have been another man. *Id.*

I would note that the question of whether such denial alone results in estoppel has not been decided by the majority in this case. In the instant case, Appellant failed to follow through on the paternity determination, voluntarily withdrew his custody action, and engaged in other dilatory behavior resulting in the majority's conclusion that Appellant is judicially estopped from interfering with S.A.J.'s stable family situation by challenging the decree of adoption.

As explained *supra,* I believe that it was well within the province of the trial court to vacate the adoption decree in this situation, even though Appellant's conduct may ultimately result in termination. Nonetheless, nothing in this dissenting opinion should be construed to suggest that Appellant is a worthy father, and after being given the opportunity to be heard, any parental rights that he may have might very well be terminated. I share the concern of the majority that permitting the trial court to vacate the adoption decree will potentially disrupt the stable family situation that Child has experienced over the past twelve years to the detriment of S.A.J. *See* Majority op. at 639, 838 A.2d at 625. However, my

great concern in that respect does not mean that I may disregard Appellant's constitutional and statutory right to notice of the termination of his parental rights.

For the forgoing reasons, I respectfully dissent.