J-A04044-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| R.S. AND D.S., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| S.D. AND M.S., | |
| Appellees | |
| v. | |
| G.L.S. II, | |
| Appellee | |
| v. | |
| S.D., | |
| Appellee | |
| v. | |
| M.S., | |
| Appellee | No. 1480 WDA 2013 |

Appeal from the Order August 15, 2013
In the Court of Common Pleas of Clearfield County
Civil Division at No(s): 2012-309--CD

BEFORE:  BOWES, WECHT, and STABILE, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 12, 2015**

R.S. and D.S., (collectively "Appellants") appeal the order granting a

petition filed by S.D. ("Mother") to dismiss Appellants' custody complaint and

vacate the concomitant custody order concerning Appellants' putative grandson, C.S. After careful review, we reverse and remand.

C.S. was born during March 2009, while Mother was engaged in a sexual relationship with Appellants' son, Putative Father. N.T., 5/2/13, at 41. The couple resided together and Putative Father assisted Mother during the delivery, identified himself as the birth father on C.S.'s birth certificate, and subsequently executed an acknowledgement of paternity. *Id*. at 50-51. Mother, Putative Father, and C.S. remained together as a family for approximately two and one-half years. While the family was intact, Appellants interacted frequently with C.S. and developed a strong bond. C.S. refers to Appellants as "Grammy and Pappy." *Id*. at 56. Mother testified during the hearing that Appellants visited C.S. periodically at Mother and Putative Father's home, and at other occasions, the family would visit Appellants' home. *Id*. at 41. In fact, she explained that C.S. spent portions of "mostly every weekend" with Appellants. *Id*.

However, Mother and Putative Father's romantic relationship began to dissolve, and the parties separated during August or September of 2011. At some point thereafter, Mother relocated temporarily to Florida without C.S. *Id*. at 23-24. With assistance from Putative Father and a paternal aunt, Appellants acted as C.S.'s caretakers during Mother's sojourn. *Id*. at 23, 25, 42-43. Mother returned to Pennsylvania during November 2011, and briefly reconciled with Putative Father. *Id*. at 24-25. However, on February 26,

2012, the couple separated permanently. *Id*. at 42. Appellants participated in the custody exchanges between Mother and Putative Father and acted as intermediaries when hostilities erupted. *Id*. at 44-45. Significantly, throughout this period, Mother acquiesced to Appellants' interaction with C.S. as the child's grandparents and never disclosed to Appellants that she doubted C.S.'s parentage.

Acting *pro se*, Appellants filed their complaint for custody of their then-nearly-three-year-old grandchild on March 1, 2012. The complaint identified Appellants as grandparents, Mother and Putative Father as parents, and indicated that C.S. was born out of wedlock. Mother did not challenge Appellants' ability to pursue custody. Instead, on May 16, 2012, she and Appellants agreed to a custody order awarding Mother and Putative Father shared legal custody of C.S. and granting Mother primary physical custody. The order granted Appellants partial physical custody of C.S. on Tuesdays and Thursdays from 10:00 a.m. until 6:00 p.m., and, on alternating weekends, it extended overnight physical custody between Friday afternoons and Sunday evenings.

The May 16, 2012 order anticipated that the parties would not petition the court for further proceedings for six months. Nevertheless, less than one month after the court entered the order outlining the parties' agreement, Mother filed a petition to modify the custody arrangement based upon the results of a privately-obtained DNA test report that concluded that

the probability of paternity of another man, G.L.S., II, was 99.99997%. Significantly, Mother not only failed to challenge Appellants' standing at that juncture, she agreed to a second custody order dated July 18, 2012, which was nearly identical to its predecessor except that it removed Appellants' periods of partial physical custody on Tuesdays. That order, which included another six-month *proviso*, did not reference Mother's private DNA report.

Three months later, on October 17, 2012, Mother filed a second petition for modification. Again, Mother failed to challenge Appellants' ability to maintain their custody action. Instead, this time she requested to modify the custody order based upon Appellants' alleged improper supervision of C.S. during their custodial periods. Specifically, due to her concerns for C.S.'s safety, Mother desired to terminate Appellants' partial custody entirely or reduce it to supervised visitation on Thursday evenings and alternating weekends.

Before the trial court entered an order disposing of Mother's second petition to modify the custody agreement, Mother filed an emergency petition reiterating identical assertions that she leveled in the October 2012 petition to modify. Although Mother did not assert any challenge to Appellants' standing, her petition characterized Appellants' relationship with C.S. as "non-biological family." Petition for Emergency Custody, 11/29/12, at 1. On December 14, 2012, the trial court dismissed Mother's second petition for modification and directed the parties to continue to follow the

custody arrangement that the parties' assented to in the July 18, 2012 order. Similarly, following an evidentiary hearing, the trial court subsequently dismissed Mother's petition for emergency custody.[1]

Meanwhile, on December 19, 2012, the trial court entered an order in a parallel custody dispute among Mother, Putative Father, and G.L.S., II, wherein the parties to that case granted to G.L.S., II periods of physical custody one evening per week and overnight custody on alternating Friday evenings. The custody rights were contingent upon court-ordered genetic testing confirming that G.L.S., II is C.S.'s biological father. Trial Court Order, 12/19/12, at 1. Significantly, the accord provided that the newly-awarded custody rights "shall not interfere with the directives set forth in [the] July 18, 2012 [order] entered [in the case-at-bar.]" *Id*. at 2. The trial court eventually established the paternity of G.L.S., II, and, as discussed *infra*, it ultimately consolidated G.L.S., II's litigation into the present case.

Thereafter, on February 1, 2013, Mother filed another petition for emergency custody. Identifying Appellants as "legalized family," this petition alleged that Appellants permitted C.S. to play near dangerous physical conditions in their household. *See* Petition for Emergency Custody, 2/1/13, at 1, 2. Based on these allegations, Mother reiterated her request

_____

[1] The trial court also found Mother in contempt "for [f]ailure to [c]omply with [the] Court's Order of July 1[8], 2012[,]" but it declined to impose any sanctions. Trial Court Order, 2/1/13, at 1.

to modify the custody accord in order to terminate Appellants' custodial rights. *Id*. at 2. The trial court eventually suspended Appellants' custodial rights for eleven days. When the trial court reinstated custodial rights, it reduced the custodial periods to Thursdays from 10:00 a.m. until 6:00 p.m., and Saturdays and Sundays from 10:00 a.m. until 6:00 p.m. on alternate weekends.

While the serial emergency petition was pending, on February 20, 2013, Mother filed a third petition to modify the custody agreement. At that time, Mother first leveled the complaint that she did not have enough custodial time with C.S. in light of the additional periods of physical custody exercised by G.L.S., II and his parents. The trial court did not reduce Appellants' custodial periods based upon this petition. In actuality, as noted *supra*, the court revised the custody order following the evidentiary hearing regarding Mother's second petition for emergency custody.

Appellants obtained counsel and filed a petition for reconsideration of the March 11, 2013 order reinstating Appellants' custody rights subject to the reduced custodial periods.[2] Mother retained counsel on March 28, 2013. After G.L.S., II successfully petitioned to have his custody suit against

---

[2] Even though the August 16, 2013 order denied Appellants' motion for reconsideration of the trial court's March 11, 2013 order reducing Appellants' custodial period, the merits of that order are not before this Court because Appellants' motion to reconsider did not toll the appeal period and Appellants failed to appeal that order within thirty days.

Mother and Putative Father consolidated with the instant custody litigation, Mother, for the first time in the year-long custody dispute, attacked Appellants' standing to pursue physical custody of then-four-year-old C.S.

Specifically, on April 8, 2013, Mother filed a motion to dismiss/motion to vacate. Mother sought to dismiss Appellants' March 1, 2012 custody complaint that formed the genesis of this litigation and to vacate all of the custody orders that flowed from that complaint. The crux of Mother's argument was that since Putative Father was not C.S.'s birth parent, Appellants lacked standing to pursue custody of C.S. pursuant to 23 Pa.C.S. § 5324. Appellants countered that Mother was estopped from challenging standing because she misled them to believe that Putative Father was the birth father. Accordingly, they asserted that their custodial rights should not be subject to divestiture.

Rejecting Appellants' contention that Mother was estopped from terminating their custodial rights, the trial court found that Mother's revelation effectively denied Appellants standing to defend their custody rights. This timely appeal followed.

Appellants present two questions for our review:

> I. Whether the trial court erred when it failed to estop [Mother] from terminating the visitation and custody rights of the appellants.
>
> II. Whether the trial court erred when it failed to recognize that the best interests of the child were served by continued visitation and custody with the Appellants, the only Grandparents the child has ever known since birth.

- 7 -

Appellants' brief at 7.[3]

We review the trial court's decision for an abuse of discretion. ***Kellogg v. Kellogg***, 646 A.2d 1246, 1250 (Pa.Super. 1994) ("Once the trial court determination is made [as to standing], it will be reviewed by this court in the same manner that we review any such determination, that is, under an abuse of discretion or error of law standard."). We recently reiterated the pertinent principles as follows:

> The concept of standing, an element of justiciability, is a fundamental one in our jurisprudence: no matter will be adjudicated by our courts unless it is brought by a party aggrieved in that his or her rights have been invaded or infringed by the matter complained of. The purpose of this rule is to ensure that cases are presented to the court by one having a genuine, and not merely a theoretical, interest in the matter. Thus the traditional test for standing is that the proponent of the action must have a direct, substantial and immediate interest in the matter at hand.
>
> . . . .

_____

[3] As we grant relief based upon Appellants' first issue, we need not address their second argument. We observe, however, that the Child Custody Law does not require trial courts to consider a child's best interest pursuant to 23 Pa.C.S. § 5328(a) when determining a party's standing to file a custody complaint.

While the issue of standing does not implicate a best-interest analysis, the trial court should engage in a complete best-interest analysis under section 5328(a) prior to altering the custody schedule. Even though the trial court terminated the then-existing physical custody arrangement without engaging in a best-interest analysis, the inquiry is warranted prior to re-instating the terms of the custody schedule outlined in the March 11, 2013 order. To be clear, however, the trial court's best-interest analysis does not negate Appellants' standing to pursue custody of C.S.

> In the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning.

*D.G. v. D.B.*, 91 A.3d 706 (Pa.Super. 2014) (quoting *J.A.L. v. E.P.H.*, 682 A.2d 1314, 1318 (1996)) (internal quotations and citations omitted).

At the outset, we observe that Mother's challenge to Appellants' standing is waived because Mother did not raise it as early as possible.[4] Instantly, Mother challenged Appellants' standing thirteen months after Appellants filed their March 2012 custody complaint. In *Kellogg*, *supra*, we held that Pa.R.C.P. 1915.5(a), regarding preliminary objections to jurisdiction or venue in custody actions, implicitly encompassed objections to

_____

[4] Despite the learned dissent's protestations to the contrary, we do not address this issue *sua sponte*. The issue was raised implicitly in Appellants' immediate response to Mother's motion to dismiss/motion to vacate, and it remains an aspect of their estoppel argument. Specifically, Appellants countered Mother's motion by asserting that she was estopped, based upon her actions and inaction, from challenging their standing to pursue their custody rights. The ten-month delay between the date that Mother obtained the results of a DNA test and the date that she finally wielded those results against Appellants' right to standing is an innate component of Appellants' estoppel claim. For example, during the ten-month delay, Mother filed at least four motions or petitions to modify the custody arrangement to which she had originally assented; however, none of those filings gave Appellants notice of her intention to object to their standing based on the results of the DNA tests that she had obtained. As Appellants' estoppel argument necessarily subsumes Mother's ten-month delay, we reject the distinguished dissent's suggestion that the issue is beyond our review.

standing.[5] We explained, "a standing challenge should be raised within the time period set forth in Rule 1915.5 so as to give a defendant notice of the other party's intention to object to the action on this ground." *Id*. at 1250. We continued, "Since resolution of the standing issue has the potential to control the outcome of the entire case without the court ever reaching the merits, it is important that the issue be raised as early as possible." *Id*.

*Kellogg*, which predates our current custody statute, involved a custody dispute between two third-party litigants. The maternal grandparent, who stood *in loco parentis* to the two children, objected to the lack of standing of the father's first wife, who had no genetic or legal relationship with the children. In relevant part, we found that objections to standing should be asserted at the earliest date between either the custody hearing or within twenty days of service of the custody complaint. However, recognizing that Rule 1915.5 provides that preliminary objections under that rule shall not delay the custody proceedings, we concluded that, "The custody hearing should proceed as scheduled despite the filing of a preliminary objection based on lack of standing." *Id*. The **Kellogg** Court

_____

[5] Pursuant to Pa.R.C.P. 1915.5(a), "A party must raise any question of jurisdiction of the person or venue, and may raise any question of standing, by preliminary objection filed within twenty days of service of the pleading to which objection is made or at the time of hearing, whichever first occurs. No other pleading shall be required, but if one is filed it shall not delay the hearing."

continued, "Once a hearing has commenced, a trial court may make the standing determination at any time, depending on the particular facts and circumstances before it." ***Id***.

We also observe that, notwithstanding Mother's obligation to comply with Rule 1915.5(a) in challenging Appellants' standing to file the custody complaint, in some instances standing in custody cases is fluid due to a change in circumstances. While our case law does not address whether a party's standing to file a custody complaint is subject to re-evaluation during a custody proceeding, our discussion in ***Kellogg*** illustrates that it is appropriate to consider standing during the pendency of the custody proceedings even though it is a threshold issue. Additionally, in other situations, this Court has re-evaluated a party's standing following a change in circumstances, such as when a parent whose rights have been terminated seeks custody or visitation as a third party. ***See In re D.M.***, 995 A.2d 371, 375-76 (Pa.Super. 2010) (mother whose parental rights had been terminated could have standing as third-party to seek custody); ***Morgan v. Weiser***, 932 A.2d 1183, 1186-87 (Pa.Super. 2007) (biological father whose parental rights had been terminated could only seek custody or visitation if he could establish standing as a third party); ***McNamara v. Thomas***, 741 A.2d 778, 781 (Pa.Super. 1999) (biological mother could attempt to demonstrate third-party standing after death of adoptive parent).

In light of our position in **Kellogg** and our instant recognition that standing in custody cases can be asserted at various times in some situations, we decline to apply Rule 1915.5(a) mechanically and find waiver simply because Mother raised her assertion beyond the periods set forth in that rule. Instead, we review Mother's actions to determine whether she acted diligently in invoking the results of the subsequent DNA test to challenge Appellants' standing to pursue custody as grandparents. We find that she did not.

Herein, Mother claimed that she suspected that Putative Father was not C.S.'s birth father and that she advised him of her doubts. While Mother could not prove her suspicions that Appellants were not genetic relatives of C.S. until she obtained the results of DNA testing, that does not excuse Mother's protracted delay once she acquired the DNA results during the ongoing custody proceedings. Mother obtained the results of a private DNA test during June 2012; however, she did not assert her standing challenge until April 2013, ten months later. Rather than assert a standing challenge immediately after receiving confirmation, Mother filed additional pleadings seeking to reduce Appellants' custodial rights for various reasons unrelated to standing. Thus, even acknowledging the fluidity of Appellants' standing in this custody case, we find that Mother's failure to raise the standing challenge as early as possible is fatal. The continued delay not only deprived Appellants of notice that Mother intended to object to their partial

custody rights due to a purported lack of standing, but it also reinforced their reliance on Mother's initial representation that they were C.S.'s grandparents. Consequently, we find the trial court erred in granting Mother's motion to dismiss/motion to vacate.

Alternatively, we conclude that Mother's actions and representations regarding C.S.'s parentage and her silence in agreeing to the initial custody order awarding Appellants' partial physical custody of C.S. were grounds under the doctrine of equitable estoppel to preclude her from challenging Appellants' standing at this juncture. Our reasoning follows.

Appellants argue that Mother is precluded from challenging their standing based upon the doctrines of judicial estoppel, equitable estoppel, and unclean hands. In rejecting Appellants' invocation of the three divergent principles of judicial estoppel, equitable estoppel, and unclean hands, the trial court addressed all of the arguments under the rubric of paternity by estoppel and concluded that estoppel was inapplicable herein because Appellants acted as grandparents rather than parents. Relying upon case law addressing the related, but distinct, doctrine of paternity by estoppel, which is codified at 23 Pa.C.S. § 5102, the trial court concluded that the rationale behind the application of estoppel in paternity actions between parents does not extend to Appellants as grandparents. The impetus for that doctrine is the public policy in favor of children being secure in knowing the identity of their parents and in favor of preventing children

from suffering the potentially damaging trauma associated with the realization that the father they have known all their lives is not, in fact, their father. As Appellants are not C.S.'s father, the trial court found that paternity by estoppel was inapplicable and that Mother's revelation effectively denied Appellants standing to defend their custody rights. For the reasons delineated below, we find that the trial court erred.

Primarily, we observe that Appellants' reliance upon judicial estoppel is misplaced. In **In re S.A.J.**, 838 A.2d 616, 620 (Pa. 2003), our Supreme Court defined judicial estoppel and explained its application. "As a general rule, a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained." The High Court iterated, "the purpose of judicial estoppel is 'to uphold the integrity of the courts by 'preventing parties from abusing the judicial process by changing positions as the moment requires.'" **Id**. at 621 (quoting **Trowbridge v. Scranton Artificial Limb Company**, 747 A.2d 862, 865 (Pa. 2000)) (select internal quotations omitted).

As judicial estoppel relates only to a party involved in a second or subsequent proceeding, it is self-evident that judicial estoppel is inapplicable where, as here, the dispute in which the doctrine is invoked is the first action between the parties, and the party against whom the doctrine is being invoked did not raise an inconsistent position in any other litigation. Stated simply, no previous proceeding exists wherein Appellants could establish

that Mother successfully assumed a position that is inconsistent with her current stance. While we recognize the crux of Appellants' argument, *i.e.*, that Mother previously treated them as the child's grandparents but currently disputes that relationship, the procedural posture of this case precludes the application of judicial estoppel. Accordingly, Appellants' reliance on the doctrine of judicial estoppel is inapt herein.[6]

Moreover, since Appellants failed to develop any legal argument regarding the trial court's refusal to apply the doctrine of unclean hands, that issue is waived. **See In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) (quoting **In re A.C.**, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). Thus, that argument also fails.

Nevertheless, while Appellants' reliance upon the doctrines of judicial estoppel and unclean hands is unavailing, we find that Mother is equitably estopped from terminating Appellants' custodial rights. Equitable estoppel is

_____

[6] To be clear, unlike the related but distinct doctrine of collateral estoppel, which protects the finality of judgments, judicial estoppel does not require a final adjudication. It is sufficient for the application of judicial estoppel that a party successfully raised an inconsistent position in a different proceeding, even if a final adjudication was never entered. **In re Adoption of S.A.J.**, 838 A.2d 616, 623 n.4 (Pa. 2003). Herein, Appellants failed to demonstrate that Mother raised an inconsistent position during any other proceeding.

founded on fairness and applies completely independently of any prior judicial decisions. *See Everett v. Anglemeyer*, 625 A.2d 1252, 1255 (Pa.Super. 1993) ("Equitable estoppel . . . refers to estoppel created by a party's conduct and has nothing to do with a prior judicial determination."). In contrast to the trial court's perspective that jurisprudence precludes the application of equitable estoppel in the case at bar, our review of the case law did not reveal a single case that addressed a non-biological grandparent's ability to invoke equitable estoppel against a birth parent who not only actively misled them to believe the child was their grandchild, but also consented to the exercise of custodial rights. Indeed, the paternity cases that the trial court relies upon do not confront the instant scenario to any extent.

Unlike paternity by estoppel, which estops a father from disclaiming paternity due to his prior conduct, in part, to protect the child from the trauma associated with the revelation, equitable estoppel binds a party to the implications created by their words, deeds or representations. In *L.S.K. v. H.A.N.*, 813 A.2d 872, 877 (Pa.Super. 2002), we explained,

> Equitable estoppel applies to prevent a party from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken. Equitable estoppel, reduced to its essence, is a doctrine of fundamental fairness designed to preclude a party from depriving another of a reasonable expectation when the party inducing the expectation albeit gratuitously knew or should have known that the other would rely upon that conduct to his detriment.

*Id*. (citations and quotation marks omitted).

- 16 -

With this principle in mind, we detail the following evidence regarding estoppel.[7]   Herein, Mother represented over a two-year period that Appellants were C.S.'s birth grandparents.  Although Mother suspected from the outset that Putative Father was not C.S's birth parent, she identified him as the father on the child's birth certificate and executed an acknowledgement of paternity that identified him as C.S.'s father.  Similarly, her actions encouraged Appellants to fashion and maintain a grandparent-child relationship with C.S.

Moreover, after Appellants initiated this custody litigation, Mother not only failed to immediately challenge their status as grandparents, but she also twice agreed to custody orders assenting to their right to exercise periods of physical custody of C.S.  Then, having conceded that right, she mounted a largely unsuccessful campaign to erode the terms of the custody arrangement.  First, she invoked the results of the privately-obtained DNA test as a basis to modify the custody agreement.  However, rather than challenge Appellants' standing or assail their ability to maintain a grandparent-child relationship with C.S., she consented to a second, slightly less arduous custody arrangement.  Over the next seven months, Mother filed four more petitions seeking to reduce Appellants' periods of partial

_____

[7] Since Mother's actions and representations throughout the history of this case are gleaned primarily from the list of docket entries and Mother's pleadings, they are not subject to inference or supposition.  Stated simply, the filings speak for themselves.

custody. None of the petitions leveled a challenge to Appellants' standing, and all but one were founded upon Mother's purported concerns about Appellants' alleged lack of proper supervision. As the trial court did not share Mother's apprehensions, the custody arrangement continued principally unchanged from the July 18, 2012 custody agreement, except for the brief eleven-day suspension and the removal of the overnight portion of the weekend visits.

The trial court ignores Mother's inaction and consent to Appellants' custody rights in declining to apply equitable estoppel to prevent Mother from invoking the results of a paternity test to strip Appellants of their custody rights. Mother misled Appellants into believing that they were paternal grandparents. Appellants have always held themselves out as C.S.'s grandparents, and with Mother's express consent and endorsement, they have exercised legitimate, court-ordered custodial rights as C.S.'s grandparents since May of 2012.

Mother's actions and representations regarding C.S.'s parentage for the first two years of the child's life and her silence in agreeing to the initial custody order induced Appellants to believe that C.S. was their grandchild. Appellants relied upon Mother's representations and omissions to their detriment, and would be severely prejudiced if Mother were permitted to invoke the results of the genetic testing at this point in order to deny their

beneficial relationship with C.S. Thus, we conclude that the trial court erred in holding that equitable estoppel was inapplicable.

Having found that Mother is equitably estopped from challenging Appellants' status as grandparents, we observe that Appellants attained standing to pursue partial custody of C.S. pursuant to 23 Pa.C.S. § 5325(2), relating to grandparent's standing for partial custody, during August of 2012, six months after Mother and Appellants' son, Putative Father, separated permanently. While Appellants' initial custody complaint sought primary custody of C.S., **all** of the custody orders that flowed from the custody complaint and the precise custody rights that Appellants are fighting to retain on appeal relate to partial physical custody under section 5325(2) of the Child Custody Law, which provides as follows:

> Section 5325(2) of the Child Custody Law provides as follows:
>
> In addition to situations set forth in section 5324 (relating to standing for any form of physical custody or legal custody), grandparents and great-grandparents may file an action under this chapter for partial physical custody or supervised physical custody in the following situations:
>
> . . . .
>
> (2) where the parents of the child have been separated for a period of at least six months or have commenced and continued a proceeding to dissolve their marriage[.]

23 Pa.C.S. § 5325(2). In ***L.A.L. v. V.D.***, 72 A.3d 690 (Pa.Super. 2013), this Court recently addressed case law under § 5325(2)'s predecessor statute,

§ 5312, to confirm that standing under § 5325 extends to grandparents of children who were born out of wedlock.

Accordingly, to the extent that Mother's standing challenge is not waived, which it is, we find that the doctrine of equitable estoppel applies to preclude Mother from challenging Appellants' standing to maintain partial physical custody of C.S., and we hold that the trial court erred in granting Mother's motion to dismiss/motion to vacate. Thus, for all of the foregoing reasons, we reverse that order and direct the trial court to reinstate the March 11, 2013 order granting Appellants periods of partial custody subject to the trial court's best-interest analysis pursuant to § 5328(a).

Order reversed. Matter remanded with directions. Jurisdiction relinquished.

Judge Wecht joins the Memorandum.

Judge Stabile files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/12/2015

- 20 -