903 A.2d 1 (2006)
In the Interest of: M.J.S., a/k/a M.W.,
Appeal of: Allegheny County Children, Youth and Families, M.W. and J.W., and M.J.S., Appellants.
Superior Court of Pennsylvania.
Argued March 28, 2006.
Filed June 26, 2006.
*2 Jennifer L. McGarrity, Pittsburgh, for M.J.S., appellant.
Wendy Kobee, Pittsburgh, for Allegheny County CYF, appellant.
Michael B. Greenstein, Pittsburgh, for R.M., participating party.
BEFORE: FORD ELLIOTT, P.J., BOWES and JOHNSON, JJ.
OPINION BY BOWES, J.:
¶ 1 The Office of Children and Youth Families ("OCYF"), the guardian ad litem for M.J.S. a/k/a M.W. ("Madison" or "child"), and M.W. and J.W. (respectively, "Grandfather" and "Grandmother," and collectively, "Grandparents"), who are the child's biological maternal grandparents, have appealed a May 4, 2005 order. In that order, the orphans' court vacated an order which terminated the parental rights of R.M., Appellee herein and the biological father of the minor child, and also vacated a separate adoption order, which decreed the child's adoption by Grandparents.[1] The court vacated the termination of R.M.'s parental rights and the adoption decree because R.M. was not notified of the termination and adoption proceedings. The orphans' court concluded that OCYF did not conduct a reasonable investigation into the identity of R.M. as a possible biological father of Madison. We find that this conclusion is not supported by competent evidence, that the court did not apply the correct burden of proof, and that the court ignored evidence that R.M.'s behavior prior to the entry of the adoption decree equitably estopped him from now asserting his paternity.[2] We therefore vacate the May 4, 2005 order and reinstate the termination and adoption orders.
¶ 2 We first outline the procedural history of this action. On January 24, 2001, *3 OCYF petitioned to involuntarily terminate the parental rights of: 1) D.W. ("Mother"), who is the biological mother of the child; 2) M.S., a man who was identified as the biological father; and 3) any "unknown father" to Madison. On February 23, 2001, the orphans' court granted termination of all parental rights to Madison, including any unknown biological father. On July 25, 2001, after petition by OCYF, an adoption decree was entered granting the child's adoption by Grandparents.
¶ 3 On June 1, 2004, R.M. petitioned to vacate the termination of his parental rights and the adoption decree. After hearings on August 31, 2004, November 4, 2004, and November 30, 2004, both the adoption decree and termination decree as to R.M. were vacated by order of court entered on May 4, 2005. The child was directed to remain in the custody of Grandparents, and OCYF was ordered to file a dependency petition. OCYF, Grandparents, and the guardian ad litem of the child filed a joint notice of appeal from the May 4, 2005 order.
¶ 4 We now examine the facts impacting our decision. Madison was born on July 29, 1997, at Sewickley Valley Hospital. Both Mother and child tested positively for the presence of cocaine. OCYF was notified and became involved in the child's care. According to the records of Sewickley Valley Hospital, Mother initially indicated that the father of the child could be one of three or four unnamed men. OCYF received a copy of the hospital records, which contain the only reference to possible fathers of Madison other than M.S.
¶ 5 The record also establishes a number of uncontradicted facts that are pertinent in this adjudication. During the period of conception, Mother had a relationship with M.S., an alcoholic with whom she lived until she was approximately one-month pregnant with Madison. M.S. was present at the hospital when the child was born and was identified as the biological father on the child's birth certificate. He attended Madison's baptism and visited her during her infancy. Significantly, both Mother and M.S. identified M.S. as the child's biological father to OCYF, and M.S. participated in OCYF proceedings and visited Madison until the child was six or seven months old. Finally, support proceedings were filed against M.S. to qualify Madison for welfare.
¶ 6 Mother, who was addicted to crack cocaine, moved in with Grandparents when Madison was three months old, and Grandparents exercised sole physical custody of Madison from that time forward. Mother later moved in with another man, who also was a drug addict.
¶ 7 OCYF petitioned to involuntarily terminate the parental rights of the biological parents of Madison, including the parental rights of Mother, M.S., and any possible unknown father. Mother was notified of the petition by personal service. Since M.S.'s address was unknown at that time, OCYF notified M.S. and any other possible unknown father by advertisement in the Pittsburgh Post Gazette and Pittsburgh Legal Journal. This alternative notification was approved by the orphans' court. Receiving no response from any potential father and since no one had registered pursuant to 23 Pa.C.S. § 5103[3] as *4 Madison's father, OCYF sought and received the termination decree. Thus, on February 23, 2001, the orphans' court entered an order terminating the parental rights of Mother, M.S., and any putative unknown father. OCYF then petitioned for Madison's adoption by Grandparents.
¶ 8 On June 1, 2004, nearly three years after Madison was adopted by her Grandparents, and more than three years after his parental rights were terminated, R.M. petitioned to vacate the termination of his parental rights and the adoption. It was stipulated that R.M. was, in fact, Madison's biological father.
¶ 9 At the hearings on this matter, R.M. claimed: 1) he was not aware that he had not been named as Madison's father on the birth certificate, had no notice that anyone else could have been named as Madison's father, was not aware of OCYF involvement with Madison, and was not aware of the termination and adoption proceedings; 2) Mother told R.M. that he was Madison's father during the pregnancy and subsequently brought Madison to visit him three to four times a month from the time that Madison was born; 3) he gave Mother cash support of $400 per month; 4) occasionally, starting in 2000, he gave Grandparents the cash support; and 5) starting in 2000, when Mother became less reliable, R.M. would go to Grandparents' house to pick up Madison for visitation.
¶ 10 R.M. also testified that he was the biological father of three girls, Delia, Ashley, and Madison, and that he had similar arrangements with respect to all three children, giving their mothers cash support or gifts and visiting the children regularly. R.M. moved into evidence various exhibits containing pictures of Madison. He claimed that one of the exhibits, Exhibit 4, contained pre-adoption pictures of him with Madison taken in 2000.
¶ 11 R.M. produced four witnesses who saw Madison at R.M.'s home; they maintained that they saw Madison at R.M.'s home beginning in 2000. R.M. also presented his accountant as a witness who supported R.M.'s testimony that R.M. used cash to pay for child support.
¶ 12 Grandparents denied receiving any cash support from R.M. and also denied that R.M. had any involvement with Madison before she was adopted. Grandmother stated that Mother told her that M.S. was Madison's father and that M.S. was at the hospital during the post-natal admission. Grandmother assumed complete care of Madison when Madison was three months old. M.S. attended Madison's baptism as the father and visited Madison at Grandmother's home until Madison was six or seven months old. In her testimony, Grandmother indicated that she never doubted that M.S. was Madison's biological father.
¶ 13 Grandmother testified that the pictures of Madison in Exhibit 4, which, as noted, were the earliest pictures of Madison produced by R.M., were taken in 2002, when she was five years old, and that in the pictures, Madison was wearing a coat that Grandmother purchased in 2002. Grandmother specifically refuted R.M.'s testimony that the pictures of Madison were taken in 2000, when the child was *5 three years old, and explained that Madison had always been "very tiny" for her age. N.T., 11/04/04, at 81. Grandmother also testified that Mother was never allowed unsupervised contact with Madison until Madison was four and one-half years old, which was consistent with the fact that R.M. could produce no pictures of Madison taken before 2002. Consequently, Grandmother's testimony indicated that Mother could not have taken Madison to visit R.M. when the child was an infant and toddler.
¶ 14 Grandparents both stated that they first met R.M. in the fall of 2002, one year after the adoption, and that R.M. started becoming involved in Madison's life in 2003. Madison's godfather supported Grandparents' testimony that R.M. was not involved in Madison's life until after the adoption proceedings.
¶ 15 Mother denied taking Madison to visit R.M. and receiving cash support from R.M. for Madison. She said that when R.M., a drug dealer who supplied her with cocaine, gave her money, it was in exchange for sexual favors. Mother stated that she lived with M.S. during the period of possible conception and that she believed that M.S. was Madison's biological father. Following Madison's birth, Mother met with a representative of OCYF and informed them that M.S. was the biological father. W.K., who also was a drug addict, resided with Mother from 1998 to 2003, testified in this matter, and confirmed that R.M. was one of Mother's drug suppliers.
¶ 16 Norma Bussey, the supervisor for parental termination cases at OCYF from 1991 to 2000, presented uncontradicted and unimpeached evidence as follows. M.S. was listed on Madison's birth certificate as Madison's biological father, and his name appeared "throughout the record." N.T., 11/30/04, at 109. Ms. Bussey testified that M.S. "attended visits with the child. He attended the petition hearing and review hearing." Id. at 123. M.S. had a support petition filed against him so that Madison could qualify for welfare. Admittedly, no acknowledgment of paternity regarding Madison was filed. However, Ms. Bussey explained that if M.S. had not come forward following the birth and had not been involved so significantly in this case, OCYF would have conducted further inquiries into Mother's statement in the hospital records that the biological father could have been one of three or four men.
¶ 17 M.S.'s involvement in this case was confirmed by Ahmed Yates, the caseworker for Madison, who stated that M.S. identified himself as Madison's father to OCYF. M.S. appeared at OCYF hearings and visited Madison at the beginning of the child's involvement with that office. R.M. did not contact OCYF about Madison until 2004. Mr. Yates confirmed that OCYF did not pursue Mother's statement about other possible fathers because M.S. immediately stepped forward as the biological father.
¶ 18 The orphans' court credited the testimony by Grandparents. It concluded that the first time Grandparents knew that R.M. could be Madison's father was after Madison was adopted. However, the orphans' court disbelieved Mother's testimony and found that Mother did accept the cash child support for Madison and did inform R.M. that he was Madison's father. Consistent with its credibility determination in favor of Grandparents, the court concluded that R.M.'s testimony about his pre-adoption contact with Madison was not credible, stating that "notwithstanding [R.M.'s] testimony to the contrary, his involvement with the child prior to her adoption was minimal" and consisted almost exclusively of payment of child support to Mother. Trial Court Opinion, 5/4/05, at 2. The court made a determination that "the *6 photographs and evidence introduced by [R.M.] all appear to involve post-adoption contact." Id. at 2. Thus, the orphans' court found R.M. not credible about visiting Madison three to four times a month from infancy, picking up Madison from Grandparents' home starting in 2000, and giving Grandparents cash support. The court credited only R.M.'s testimony that Mother informed him that he was Madison's father and that he gave Mother cash child support.
¶ 19 We now review the impeachment of R.M. As noted, R.M. testified that Mother brought Madison to visit him three to four times a month from birth, but on cross-examination, he admitted that he told reporters from a Pittsburgh newspaper that he visited the child only once a month. While claiming to have visited the child almost weekly since she was born, R.M. had no pictures of Madison as an infant or toddler.
¶ 20 R.M. testified that he was never told that he should use checks as child support:
Q. Has anyone ever advised you that you should pay support by check?
A. No.
Q. Including your accountant, Mr. Freis? Has he ever advised you you should pay your support with a check?
A. We had discussed paying by check, but it didn't seem to make any difference. It wasn't tax deductible, I couldn't write it off of my income tax, or anything like that. It didn't matter if I had receipts for it.
Q. But he did in fact advise you, did he not?
A. To do checks?
Q. Yes.
A. I don't think he specifically said that, you know, I should use checks, no.
N.T., 8/31/04, at 106. R.M.'s accountant, his own witness, contradicted that testimony, stating that he repeatedly and emphatically advised R.M. to pay child support with a check. Id. at 222.
¶ 21 Appellants also called Mary C., the mother of R.M.'s daughter Delia, to testify for impeachment purposes. As noted supra, R.M. stated that Delia was his biological daughter, and he claimed that he routinely visited her and gave her gifts. Mary C. refuted R.M.'s testimony, telling the court that R.M. did not regularly visit Delia, who was thirteen years old at the time of the hearing, and did not give her gifts. Mary C. informed the court that R.M. stopped giving Delia gifts in 1999, R.M. has no relationship with Delia, and R.M. "never came to visit my child like it was his daughter ever." N.T., 11/30/04, at 105.
¶ 22 R.M.'s exhibits of pictures of Madison also became key impeachment evidence. As noted, R.M. did not produce a single photograph of Madison as an infant or toddler. In order to establish pre-adoption contact, R.M. produced Exhibit 4, which he claimed were pictures of Madison in 2000, when she was three years old. As noted, the orphans' court credited Grandmother's testimony that she knew Exhibit 4 contained pictures of Madison when she was five years old because in that picture, Madison was wearing a coat that was purchased in 2002. All of R.M.'s remaining pictures were taken when Madison was older than five.
¶ 23 The most significant impeachment involved R.M.'s claim that he never knew that he was not named as Madison's father on her birth certificate, was not aware of any OCYF involvement with Madison, and had no reason to inquire into the status of his parental rights. Appellants established irrefutably that R.M. was lying in that regard. As noted, R.M. was the biological *7 father of three daughters, Delia, Ashley, and Madison. In 1999, two years before Madison was adopted, R.M. was involved in legal proceedings in Erie County involving Ashley.
¶ 24 The following was uncontradicted. From 1996 through 1998, R.M. had a sexual relationship with a woman named Julianne and had a biological daughter, Ashley, born of that relationship. Julianne placed the name of Charles S. on Ashley's birth certificate as her biological father and collected support from him. Three years later, Julianne left Charles S., and he instituted a custody action with respect to Ashley. In 1999, R.M. petitioned to intervene in that action, claiming to be Ashley's biological father. A hearing was held with respect to this petition on December 3, 1999, and a transcript of that hearing was accepted into evidence in this action. At that hearing, R.M.'s testimony mirrored his testimony in this action. R.M. claimed that he gave monthly cash support to Julianne for Ashley and that he visited with Ashley on Mondays three or four times a month.[4] He advanced the same claim in that case that he did in this case: he was unaware that another man's name was on the birth certificate and had no reason either to doubt that his name was not on the birth certificate or to inquire into the status of his parental rights.
¶ 25 R.M. acknowledged seeing a copy of the trial court opinion in the Erie County case. The trial court therein denied R.M.'s right to intervene, and in its opinion, the court found it significant that R.M. had made support payments in cash rather than by check, had made no attempt to establish his paternity until three and one-half years after Ashley was born, and never placed Ashley on his health insurance. In addition, in its opinion, the trial court observed that Charles S. had signed an acknowledgment of paternity.
¶ 26 Although informed in 1999 that these facts were dispositive of his rights relative to Ashley, R.M. never inquired into signing an acknowledgment of paternity with respect to Madison, never attempted to establish his paternity of Madison, never inquired into the contents of Madison's birth certificate, continued to pay Madison's child support in cash, and never placed Madison on his health insurance.
¶ 27 In the present proceeding, R.M. admitted that he knew that Charles S. had been sued for child support for Ashley. R.M. acknowledged that he was aware that Julianne had to file for child support against Charles S. as Ashley's father to qualify Ashley for welfare. R.M. also acknowledged that he knew Madison was on welfare after she was born. N.T., 11/04/04, at 48.
¶ 28 Therefore, R.M. had to have known that he was not named as Madison's father on her birth certificate because he had not been sued as her father in a support action. Thus, the record admits of no other conclusion but that R.M. knew in 1999 that someone else had been listed as Madison's father so that she would qualify for welfare and that that person had been sued in a support action in order to so qualify Madison. The record thus establishes conclusively that R.M.'s testimony that he thought he was named on Madison's birth certificate as the biological father and had no reason to inquire into the matter was a total fabrication.
¶ 29 We now review the law.

*8 An adoption decree is presumed to be valid, and the person challenging it bears the burden of showing its invalidity by clear and convincing evidence. In the Matter of the Adoption of Christopher P., 480 Pa. 79, 84, 389 A.2d 94, 97 (1978); Singer Adoption Case, 457 Pa. 518, 522, 326 A.2d 275, 277 (1974); Chambers Appeal, 452 Pa. 149, 152-153, 305 A.2d 360, 362 (1973); List Adoption Case, 418 Pa. 503, 508-509, 211 A.2d 870, 873-874 (1965). In List Adoption Case, supra, the Supreme Court listed five principles of law which are pertinent to a collateral attack on an adoption decree.
In determining this appeal certain principles of law must be kept in mind: (1) an adoption decree entered by a court having jurisdiction over the subject matter and the parties is generally immune from collateral attack, particularly where the record shows a substantial compliance with the adoption statute; (2) where the record in the adoption proceedings affirmatively reveals a lack of jurisdiction, then the adoption decree is subject to collateral attack; (3) notice to a natural parent of the adoption proceedings and the consent of a natural parent, where necessary, are jurisdictional prerequisites in an adoption proceeding; (4) when an adoption decree is collaterally attacked, the entry of the decree raises a presumption of its validity and regularity and an implication arises that the court did find the necessary facts and did perform all the steps essential to the jurisdiction of the court; (5) the burden is upon the person attacking an adoption decree to establish its invalidity by clear and convincing evidence.

Id. (footnotes omitted).
In re Adoption of B.E.W.G., 379 Pa.Super. 264, 549 A.2d 1286, 1288 (1988).
¶ 30 Our scope and standard of review are as follows:
This court must determine whether the record is free from legal error and the orphans' court's factual findings are supported by the evidence. Because the court sits as the fact-finder, it determines the credibility of the witnesses and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

In re Adoption of A.M.B., 2002 PA Super 321, 812 A.2d 659, 662 (Pa.Super.2002). Our scope of review when the orphans' court has granted a petition to vacate an adoption "is limited to determining whether the trial court's findings are supported by competent evidence or whether the court abused its discretion or committed an error of law." In re Adoption of S.A.J., 575 Pa. 624, 838 A.2d 616, 620 (2003) (quoting In the Matter of the Adoption of Christopher P., 480 Pa. 79, 389 A.2d 94, 98 (1978)).
In re Adoption of R.J.S., 889 A.2d 92, 96 (Pa.Super.2005).
¶ 31 The basis for the orphans' court's decision to vacate the termination and adoption decrees rested upon Pennsylvania Orphans' Court Rule 15.6 (emphasis added), which provides:
Notice to every person to be notified shall be by personal service, service at his or her residence on an adult member of the household, or by registered or certified mail to his or her last known address. If such service is not obtainable and the registered or certified mail is returned undelivered, then:
(1) no further notice shall be required in proceedings under Rules 15.2 or 15.3, and

*9 (2) in proceedings under Rules 15.4 and 15.5, further notice by publication or otherwise shall be given if required by general rule or special order of the local Orphans' Court.
If, after reasonable investigation, the identity of a person to be notified is unknown, notice to him or her shall not be required.
¶ 32 The court concluded that OCYF did not engage in a reasonable investigation because it was aware of the notation in the hospital records that Mother said that the father could be one of three or four men, but it failed to ask Mother about their identities. Specifically, the court found "that mother intentionally concealed the identity of [R.M.] and his interest in the child. Further, the court finds that [OCYF] failed to make a reasonable investigation. As a result, [R.M.] did not receive notice of the proceedings to which he was entitled and the termination as it relates to him as well as the adoption decree must be set aside." Trial Court Opinion, 5/4/05, at 4. As noted, the orphans' court's conclusion that OCYF failed to make a reasonable investigation into R.M.'s identity rests on a single piece of evidence, the records of Sewickley Valley Hospital indicating that Mother stated that Madison's father could have been one of three or four men. The court decided that OCYF did not make a reasonable investigation solely on the ground that it did not ask Mother to name those men. The court also found that Mother was not credible when she testified that if asked in 1997, she would not have told OCYF about R.M.
¶ 33 We agree with Appellants' contentions that the orphans' court's decision is not supported by competent evidence and that the court erred in failing to find that R.M. was equitably estopped from attacking the adoption decree. We conclude that the orphans' court abused its discretion in the following respects. First, the court committed an error of law by failing to properly allocate the burden of proof to R.M. Under the law, R.M. was required to establish the invalidity of the adoption decree by clear and convincing evidence, and the decree itself was presumed to be valid because the record herein demonstrated substantial compliance with the notice requirements to R.M.
¶ 34 In connection with the question of substantial compliance with the notice requirements, the court concluded that OCYF failed to conduct a reasonable investigation. In making this determination, the court erroneously ignored two key pieces of evidence. First, the court did not acknowledge the unrebutted evidence of M.S.'s significant and ongoing involvement with OCYF and Madison and that this involvement occurred after Mother's statement that the father could be one of three or four men. M.S. came forward after Mother made these statements and identified himself as the father. Mother thereafter told OCYF that M.S. indeed was the father. M.S. was present at the birth, attended the baptism, visited the child for months after the birth, and participated in the ongoing OCYF proceedings. We would not question the orphans' court determination that OCYF should have asked about the other three or four men's identities in the absence of M.S.'s post-birth involvement. However, the record cannot sustain a finding that it was unreasonable that OCYF failed to ask about the other men in light of the actions of M.S. and Mother following Mother's statement at Sewickley Hospital.
¶ 35 In addition, the court's conclusion that OCYF could have uncovered R.M.'s identity in 1997 if OCYF had asked Mother is not supported by competent evidence of record. As noted, the court specifically found that Mother intentionally concealed *10 R.M.'s identity in order to obtain cash child support from him and keep it for herself. Then, the court stated that it disbelieved Mother's testimony that she would not have identified R.M. as Madison's father if she had been asked by OCYF. These two conclusions are inherently inconsistent. The court specifically found that Mother was intentionally concealing R.M.'s identity from OCYF and Grandparents. In light of this irrefutable fact, the only logical inference is that Mother would not have told OCYF about R.M. if OCYF had asked in 1997 who the other three or four possible fathers were.
¶ 36 Most significantly, when vacating the decree, the orphans' court overlooked R.M.'s unexcused failure to assert his parental rights to Madison until after she was adopted. R.M.'s inaction resulted in the present situation, wherein Madison is to be uprooted from a stable family environment that has been in existence since she was three months old. The uncontradicted evidence established that by 1999, before his parental rights were terminated and the adoption decree was entered, R.M. was aware that someone else had been named as Madison's father. Further, as a result of his participation in the 1999 litigation and receipt of that trial court's opinion therein, R.M. was cognizant of his ability to file an acknowledgement of paternity under 23 Pa.C.S. § 5103. While the filing of such an acknowledgement is voluntary and would not normally impact on a father's right to notice of termination and adoption proceedings, the facts of this case make this provision particularly relevant when considered in conjunction with the Supreme Court's decision in In re Adoption of S.A.J., 575 Pa. 624, 838 A.2d 616 (2003).
¶ 37 In S.A.J., the biological father was not notified about his child's adoption proceedings even though the mother knew that he was possibly the biological father. The Supreme Court upheld the validity of the adoption decree even in the absence of notice. Eleven years before the adoption proceeding, the father had been sued for support and denied paternity in that action. The Supreme Court applied the doctrine of judicial estoppel as well as the doctrine of equitable estoppel, holding that the father's previous denial of paternity in a judicial proceeding as well as his inaction during the child's life prevented him from asserting that the adoption proceedings were invalid because he was not notified of those proceedings as the child's biological father.
¶ 38 The Court concluded that the father's denial of paternity in the support action to avoid paying support prevented him from later claiming his paternity. While the father explained that his denial was made on the advice of counsel and in order to obtain verification that he was the child's biological father, the Supreme Court rejected his explanation as reasonable in light of these facts:
Despite [father's] words of explanation, his actions, or, more appropriately, his failure to act during the life of Child over the past twelve years, belie his assertion that he wanted to establish paternity. When he denied paternity, Child was just over one year old. When [father] filed for partial custody and then to vacate the adoption by [the biological mother's] Husband, Child was eleven years old. In all that time, he never took a blood test or DNA test to establish paternity. He also never provided support for Child, never played any role in her life, and never made any demands on Mother and Husband to do so. He did not contest the termination of visitation in 1990 and did not pursue his 1990 case for partial custody, which *11 the court terminated in 1993 after issuing a warning and notice to him.
Id. at 634, 838 A.2d at 622. The Court noted that parental obligation is a duty requiring affirmative performance.
¶ 39 The Supreme Court also concluded that the father was equitably estopped from asserting paternity in light of his failure to assert paternity and the fact that the child had a stable paternal figure in the biological mother's husband. It noted that the child in that case had been parented by the biological mother's husband and that the child's life would be seriously disrupted if the biological father was permitted to vacate the adoption decree entered on behalf of the husband. The Supreme Court observed that the father voluntarily had been absent from the child's life for eleven years and that the mother and her husband assumed responsibility for rearing and supporting the child. The Court stated that the father was "equitably estopped from undoing the situation that he created, by his words and by his failure to act." Id. at 639-40, 838 A.2d at 625.
¶ 40 While the doctrine of judicial estoppel could not apply in the instant case due to the fact that R.M. never denied paternity in a judicial proceeding, R.M.'s inaction herein is akin to the conduct of the father in S.A.J. Thus, the doctrine of equitable estoppel, which was invoked alternatively by that court, applies to this case. R.M. testified that he was aware that Madison was on welfare. He knew that Madison would not have qualified for welfare unless Mother had named a father and that father had been sued for support. R.M. failed to take any action to assert his paternity despite being aware of his right to file an acknowledgment of paternity. Madison has been raised by her Grandparents and as noted by the orphans' court, R.M. did not become even tangentially involved with Madison until she was five years old. We cannot allow this child's life to be disrupted when R.M.'s own failure to act resulted in the present situation. Clearly, the reasoning of S.A.J. applies. Equitable estoppel thus prevents R.M. from attempting to revoke the child's stable family situation because R.M. failed to establish his paternity when he knew that someone else was named as Madison's father and knew of the appropriate steps to take to protect his status.
¶ 41 In conclusion, R.M. did not sustain his burden of proving the adoption decree was invalid by clear and convincing evidence. There was no competent evidence to support the orphans' court's decision because the record demonstrates that there was substantial compliance with the notice requirements of the adoption statute, rendering the adoption decree immune from collateral attack. In addition, R.M. is equitably estopped from attacking the validity of the adoption decree.
¶ 42 The May 4, 2005 order is vacated. The February 23, 2001 order involuntarily terminating the rights of R.M. is reinstated. The July 25, 2001 adoption decree is reinstated. Case remanded. Jurisdiction relinquished.
¶ 43 P.J. FORD ELLIOTT Concurs in the Result.
NOTES
[1] In In re H.S.W.C.-B, 575 Pa. 473, 836 A.2d 908 (2003), the Supreme Court held that jurisdiction in family cases can be assumed over an order maintaining the status quo because those types of orders can place the needs and welfare of a child at risk. Herein, the needs and welfare of the child are at risk due to the vacation of an adoption decree. Thus, Appellants properly filed an appeal from the order, even though it is not final in the sense that further proceedings are contemplated. See also In re A.L.D., 797 A.2d 326, 335 (Pa.Super.2002) (cited with approval by our Supreme Court and stating, "[A]ll decrees in termination of parental rights cases are now considered final, appealable orders.").
[2] As the needs and welfare of Madison is a consideration in the equitable estoppel analysis, we conclude that contrary to R.M.'s position, this issue was preserved by Appellants' assertion in their Pa.R.A.P. 1925(b) statement that the orphans' court should have considered Madison's needs and welfare before vacating the adoption decree.
[3] Section 5103, acknowledgment and claim of paternity, provides in relevant part:

(a) Acknowledgment of paternity.  The father of a child born to an unmarried woman may file with the Department of Public Welfare, on forms prescribed by the department, an acknowledgment of paternity of the child which shall include the consent of the mother of the child, supported by her witnessed statement subject to 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities). In such case, the father shall have all the rights and duties as to the child which he would have had if he had been married to the mother at the time of the birth of the child, and the child shall have all the rights and duties as to the father which the child would have had if the father had been married to the mother at the time of birth.
The evidence establishes that OCYF searched for an acknowledgment when the termination/adoption proceedings in this action were instituted.
[4] Since R.M. admittedly traveled for business from Tuesday to Friday, we are intrigued that he was able to simultaneously exercise visitation over Ashley in Erie on Mondays while he also was visiting Madison in the Pittsburgh area on Mondays.