J-A28003-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| M.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| K.S. | : | |
| | : | |
| | : | No. 914 MDA 2018 |
| APPEAL OF: J.W.M. | : | |

Appeal from the Order Entered May 8, 2018
In the Court of Common Pleas of Lancaster County Civil Division at
No(s): CI-17-09360

BEFORE: LAZARUS, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED DECEMBER 17, 2018**

J.W.M. (Petitioner) appeals from the order, entered in the Court of Common Pleas of Lancaster County, denying his petition to intervene in the custody action between K.S. (Mother) and M.S. (Father). After our review, we affirm the order based on the opinion authored by the Honorable Jeffrey A. Conrad.

To summarize, Petitioner had a relationship with Mother approximately seven years ago; they dated, although not exclusively, between May and July of 2011. Mother gave birth to daughter (Child) in April of 2012. Mother told Petitioner at the time she found out she was pregnant that he could be Child's father, and she let him know when Child was born. In the six years since Child's birth, however, Petitioner has done nothing to support Child, emotionally or economically. Petitioner did not seek paternity testing.

When Child was two months old, Mother and Father began their relationship and they started living together when Child was six months old. Mother and Father married in September 2013, when Child was a toddler. Thereafter, Mother and Father had two children. At all times, Father has supported Child and treated her as his own.

On October 16, 2017, Father filed a complaint in divorce (Complaint) against Mother. In the Complaint, Father sought custody of Child and the parties' two biological children.

Petitioner, having reconnected with Mother in 2017 via social media, filed a petition to intervene and sought court-ordered paternity tests. The court scheduled a hearing for May 7, 2018. A few days prior to the scheduled hearing, Father's counsel filed a praecipe to withdraw the Complaint. Following the hearing, at which both parties and Petitioner testified, the court denied Petitioner's petition to intervene. **See** Order, 5/7/18.[1] This appeal

_____

[1] The order reads:

> And now, this 7th day of May, 2018, following a hearing on the Petition to Intervene attended by Plaintiff [M.S.], Defendant [K.S.], and Potential Intervenor [J.W.M.], each with counsel, the Petition to Intervene is hereby DENIED.*
>
> *In **Buccieri v. Campagna**, [889 A.2d 1220 (Pa. Super. 2005)], the Superior Court denied a putative father's request for genetic testing on the grounds that he was estopped from making a paternity claim because he was on notice that the child may be his yet he failed to pursue a claim for seven years. This case is factually similar in that [Petitioner] knew he was a potential father prior to or shortly

J-A28003-18

followed. Both the trial court and Petitioner have complied with Pa.R.A.P. 1925.

Petitioner raises the following claims on appeal:

_____

> after [Child's] birth but did nothing to pursue confirmation of paternity for nearly six years. [Petitioner] relies on the case of ***K.E.M. v. P.C.S.***, [38 A.3d 798 (Pa. 2012)], in which the Supreme Court directed that in "cases involving separation and divorce . . . the Uniform Act on Blood Tests to Determine Paternity is now to be applied on its terms insofar as it authorizes testing." ***Id.*** at 810-11. The Act provides that "[i]n any matter . . . in which paternity, parentage or identify of a child is a relevant fact, the court . . . upon motion of any party to the action . . . shall order the mother, child and alleged father to submit to blood tests." 23 Pa.C.S.A. § 5104(c). However, [Petitioner] is not a party to this action, and this case is distinguishable from ***K.E.M.*** because it is not one involving separation and divorce. While [Father] did file divorce proceedings against [Mother], those claims have been withdrawn and both [Mother and Father] testified credibly of their reconciliation. More importantly, [Petitioner] advanced no evidence that it is in [Child's] best interests that he be allowed to disrupt her relationship with [Father]. [Father] has been her father since she was six months old. He has cared for her financially, practically, and emotionally. He treats her the same as he does his biological children with [Mother]. He signed a support order with the Office of Domestic Relations during the separation and even attempted to have his name listed on her birth certificate – both events occurring prior to [Petitioner's] Petition to Intervene. In short, [Father] is the only father [Child] has ever known, and the court finds that it is not in her best interests to disrupt that relationship.

Order, 5/7/18.

- 3 -

1. Whether the court erred and abused its discretion in not permitting [Petitioner] to intervene in this custody action?

2. Whether the trial court erred and abused its discretion in its application of the doctrine of paternity by estoppel to the facts and circumstances of this case?

3. Whether the trial court erred and abused its discretion in not considering the fraud on the part of Mother, and its effect on [Petitioner's] actions and the course of this matter?

4. Whether the court erred and abused its discretion in not ordering genetic testing pursuant to statute and case law under the facts and circumstances of this case?

Appellant's Brief, at 5-6.

> Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father [s]he has known all his life is not in fact h[er] father.

*Fish v. Behers*, 741 A.2d 721, 724 (Pa. 1999) (citation omitted). The doctrine of paternity by estoppel is rooted in the best interests of the child. *Vargo v. Schwartz,* 940 A.2d 459 (Pa. Super. 2007).

After our review, we conclude the trial court properly applied the doctrine of paternity by estoppel and precluded application of the Uniform Act on Blood Tests to Determine Paternity. 23 Pa.C.S.A. § 5104.[2] We agree with the trial court's conclusion that *Buccieri* is dispositive and that Petitioner's reliance on *K.E.M.* is misplaced. Under the circumstances of this case,

---

[2] The Uniform Act on Blood Tests to Determine Paternity creates a statutory right to obtain blood testing to determine paternity; the right is not absolute and must be balanced against competing societal/family interests. *See Miscovich v. Miscovich*, 688 A.2d 726 (Pa. Super. 1997).

Petitioner is estopped by his own past conduct from obtaining genetic tests to establish his paternity and/or assert his paternal rights. *Buccieri*, *supra*. Where the putative father has failed to exercise his parental claim, there is no reason to disturb the familial relationship that has developed among Mother, Father and Child. *Id.* "When balanced against societal concerns for constancy in [Child's] life, we see no reason to allow [Petitioner] to march into [Child's] life at this late date." *Buccieri*, 887 A.2d at 1227. *See also B.K.B. v. J.G.K.*, 954 A.2d 630, 636 (Pa. Super. 2008) (concluding that alleged biological father's failure to pursue parental rights until child was nine years old estopped him from challenging mother's former husband's status as child's father); *Moyer v. Gresh*, 904 A.2d 958, 962 (Pa. Super. 2006) (where biological father voluntarily relinquished parental rights to another man during first nine years of child's life, biological father was estopped from asserting parental rights towards child); *In re M.J.S.*, 903 A.2d 1, 10 (Pa. Super. 2006) (holding biological father estopped from asserting paternity where he knew another man had been named father, and despite having right to acknowledge paternity, he waited to assert paternity until three years after child had been adopted).

The legal fictions perpetuated through the years, including the proposition that genetic testing is irrelevant in certain paternity cases, retain their greatest force where, as here, there is an intact family seeking to defend itself against third-party intervention. The evidence of record here supports the trial court's findings; thus, we will not disturb them. *See Vargo*, *supra*

- 5 -

at 462. Accordingly, we affirm the trial court's order and direct the parties to attach a copy of Judge Conrad's opinion in the event of further proceedings.

Order affirmed.

Judge Musmanno joins the Memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/17/2018

ENTERED AND FILED
PROTHONOTARY'S OFFICE
LANCASTER, PA
***Electronically Filed****
Jun 29 2018 1:16 PM

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA

CIVIL ACTION - CUSTODY

M̶       ̶ ̶S̶̶̶̶ ̶,                          :
          Plaintiff,                        :
                                            :
                                            :
          v.                                :          No. CI-17-09360
                                            :
                                            :
K̶̶   ̶ ̶ ̶S̶̶̶ ̶ ̶ ̶ ̶,                         :
          Defendant.                        :

## ORDER

AND NOW, this 29th day of June, 2018, upon the Notice of Appeal of this court's order entered on May 7, 2018, the court files this opinion pursuant to Pennsylvania Rule of Civil Procedure 1925(a)

### I. PROCEDURAL HISTORY

This case began when M̶   ̶ ̶S̶̶̶̶ ̶ ("Husband") filed a complaint in divorce against K̶̶ ̶̶̶S̶  ̶ ̶ ("Mother"). On January 22, 2018, the parties entered into an agreement regarding the custody of their three children. This was made an order of court on January 30, 2018. On April 4, 2018, J̶ ̶  ̶ ̶M̶ ̶ ("Petitioner") filed his Petition to Intervene and request for genetic testing. On May 3, 2018, Mother and Father filed a praecipe requesting the withdraw of the divorce complaint. On May 7, 2018, the court held a hearing on the Petition to Intervene and subsequently entered an order denying Petitioner's request. Petitioner filed his Notice of Appeal and concurrent statement of matters complained of on appeal on June 5, 2018. This opinion follows.

### II. STATEMENT OF FACTS

Petitioner testified that he met Mother seven years ago and the two began dating a few months after meeting (Notes of Testimony, May 7, 2018, p. 7). They dated for two or three

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA R.C.P. NO. 236
NOTIFICATION - THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA
Jun 29 2018 1:16 PM

1

APPENDIX A

months, between May and July 2011 (Id., p. 7).[1] Petitioner testified that he believed their relationship to be exclusive but admitted Mother broke up with him several times during this period (Id., p. 8). He was also aware that Mother dated other men during and around this time (Id., p. 9). He learned of Mother's pregnancy in September of that year (Id., p. 9) and attended one of Mother's prenatal appointments in December or January (Id., p. 10, 33). Mother sent him a text message the day after the Child's birth, in April 2012, and Petitioner visited Mother within the week and held the baby (Id., p.11). He was interested to see if the Child looked like him (Id., p.11). However, he also testified that he had no indication—until reconnecting with Mother in November of 2017—that he was the Child's father (Id., p. 25). At no point during this time did Mother tell Petitioner that he was the father (Id., p. 9, 11). In June, following the Child's birth, Mother blocked Petitioner on social media, did not list him on the birth certificate, and did not file a support action against him (Id., p. 11-12). Instead, Mother told him that she was going to be with a man named Eric, and that Eric would take care of her and the Child (Id., p. 13). She did not tell Petitioner that Eric was the Child's father, but Petitioner assumed he was (Id., p. 38). Petitioner also testified that Mother did not ask him to do a paternity test following the Child's birth (Id., p. 11).

Mother and Petitioner did not speak again until 2017, when they made contact again via social media (Id., p. 16). At that time, Mother told Petitioner that Eric had taken a paternity test, but the test showed Eric was not the father (Id., p. 16-17). She also told him he might be the father and suggested he take a paternity test. However, before he could do so, Mother told him she could no longer speak to him about the Child (Id., p.17). At this point Petitioner wanted to take a paternity test, but he was willing to wait until Mother was ready (Id., p. 21). Petitioner eventually took it upon himself to search the divorce records, where he found his given name—

[1] Petitioner testified that his relationship with Mother occurred between May and July of 2012. As the Child was born in April of 2012, these dates are obviously incorrect. The court has referenced the correct dates here.

2

not his surname—listed as a possible father of the Child in Husband's complaint for divorce (Id., p. 22). Once Petitioner filed his petition to intervene, Mother re-contacted him. She asked him to withdraw his petition but suggested he should eventually be introduced to the Child (Id., p. 22-23).

Mother recitation of the facts differs significantly from Petitioner's account. According to Mother, their relationship lasted a few months in the summer of 2011, but Petitioner knew from the beginning that they were not exclusive and she was also seeing other men (Id., p. 46). When she learned she was pregnant, she told Petitioner right away that he might be the father (Id., p. 47). She believed then that Petitioner wanted nothing to do with the Child (Id., p. 56). She testified that she remained in contact with him throughout her pregnancy, but he showed little interest (Id., p. 47). She texted him on the day of the Child's birth, and he visited once (Id., p. 48). She told him she wanted a paternity test, and she contacted him again after Eric proved not to be the father—but Petitioner did not respond (Id., p. 49). After that, she did not hear from Petitioner again until November of 2017 (Id., p. 49). They met, but Mother limited her contact with Petitioner. He had been obsessive about her in 2011, and she believed he was developing an obsession again. She testified that he repeatedly asked her about her relationship with Husband, from whom she was then separated. She eventually blocked him on social media (Id., p. 51).

Mother testified that she has been in a relationship with Husband since the Child was two months old, they began living together when she was six months old, and they married in September of 2013 (Id., p. 52). Husband has been the Child's father since the couple began living together. He provides for her and cares for her on a daily basis (Id., p. 53). They have two other children together, and Husband treats the Child the same as he treats his biological children (Id., p. 53). The Child does not yet know that Husband is not her biological father, as Mother and Husband agreed that they should wait to tell her until she is older (Id., p. 54). Along with their

3

other Children, the Child is excited that Mother and Husband intend to reunite (Id., p. 55). Mother agrees with Husband's intention to withdraw the divorce claims (Id., p. 70).

Husband corroborated Mother's testimony regarding their relationship (Id., p. 70-71). He began living with Mother and the Child when the Child was six or seven months old ((Id., p. 72). He has been a father figure to her for nearly that long (Id., p. 82). She calls him "dad" and has done so since she could talk (Id., p. 72). He takes her to her medical appointments and knows about her special medical needs (Id., p. 73). He is involved with her education, including attending parent-teacher conferences (Id., p. 73, 81). He takes her out for one-on-one activities (Id., p. 80). When Husband and Mother separated, he signed an acknowledgement of paternity with the office of domestic relations, and the Child was included on the resulting support order (Id., p. 78-79). He even attempted to have his name listed as the father on the Child's birth certificate, a step which Mother supported (Id., p. 82-83). Husband took these steps prior to Petitioner's petition to intervene (Id., p. 82-83). Finally, Husband confirmed Mother's testimony that he has withdrawn the divorce claims, and he and Mother intend to reunite (Id., p. 74).

## III. STANDARD OF REVIEW

When an appellate court is faced with a question of law, its standard of review is *de novo* and its scope of review is plenary. K.E.M. v. P.C.S., 38 A.3d 798, 803 (Pa. 2012). However, the appellate standard of review for a paternity decision is abuse of discretion. D.M. v. V.B., 87 A.3d 323, 327 (Pa. Super. 2014). "Abuse of discretion exists where the trial court overrides or misapplies the law, or if there is insufficient evidence to sustain its order. R.W.E. v. A.B.K., 961 A.2d 161, 165 (Pa. Super. 2008) citing Vargo v. Schwartz, 940 A.2d 459, 462 (Pa. Super. 2007). Absent an abuse of discretion or insufficient evidence to sustain the support order, the reviewing court will not interfere with the broad discretion afforded the trial court. Haselrig v. Haselrig, 840 A.2d 338, 339 (Pa. Super. 2003) quoting Strawn v. Strawn, 664 A.2d 129, 131 (Pa. Super.

4

1995). Moreover, the resolution of factual issues is a matter for the trial court, and the reviewing court will not disturb the trial court's findings if they are supported by competent evidence. Doran v. Doran, 820 A.2d 1279, 1282 (Pa. Super. 2003). "The finder of fact is entitled to weigh the evidence presented and assess its credibility. The fact finder is free to believe all, part, or none of the evidence and the [appellate court] will not disturb the credibility determinations of the court below." 904 A.2d 15, 20 (Pa. Super. 2006) (internal citations and quotations omitted).

## IV. DISCUSSION

Petitioner's statement of matters complained of on appeal lists seven paragraphs. However, these paragraphs do not each contain a separate issue. Paragraph 1 is a broad and vague statement of the court's error. Paragraphs 2 and 3 question the courts application of paternity by estoppel. Paragraphs 5, 6, and 7 question the court's analysis of the best interest of the Child. Rather than reproduce Petitioner's statement of errors verbatim, the court summarizes them as follows:

    A. The court erred in its application of the doctrine of paternity by estoppel.
    B. The court erred in not considering the fraud on the part of Mother.
    C. The court erred in its consideration of the best interests of the Child.

This opinion shall address each of these condensed matters in turn.

### A. The court erred in its application of the doctrine of paternity by estoppel.

This presumption of paternity does not apply in this case. The Child's birth occurred prior to the commencement of Mother's relationship with Husband, so the question of her paternity does not impinge upon their marriage. No party argues that Husband is the Child's biological father, but Mother and Husband do argue that he is her father by way of estoppel: because he has formed a parent-child bond with her; cared for her financially, physically, and emotionally; and held himself out has her father.

5

In K.E.M. v. P.C.S., the Pennsylvania Supreme Court stripped away much of the substance of the doctrine of paternity by estoppel. While the Court still found place for the doctrine in Pennsylvania law, it held that "the determination of paternity by estoppel should be better informed according to the actual best interests of the child, rather than by rote pronouncements grounded merely on the longevity of abstractly portrayed (and perhaps largely ostensible) parental relationships." K.E.M. v. P.C.S., 38 A.3d 798, 809 (Pa. 2012). This required trial courts to develop an extensive record, including testimony of the legal and biological fathers.

In K.E.M., the Court also directed that in "cases involving separation and divorce . . . the Uniform Act on Blood Tests to Determine Paternity is now to be applied on its terms insofar as it authorizes testing." K.E.M., 38 A.3d at 810-11. The Act provides that "[i]n any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court . . . upon motion of any party to the action .... shall order the mother, child and alleged father to submit to blood tests." 23 Pa.C.S.A. § 5104(c). Petitioner relies upon this statute and the Supreme Court's direction in K.E.M. to argue that this court is compelled to order genetic testing. However, the statute applies only to parties. Petitioner is not a party to this action; he is as of yet only a potential party. Furthermore, while the instant case was previously one involving separation and divorce, by the time of the hearing this was no longer the case. While Husband did file divorce proceedings against Mother, at the time of hearing those claims had been withdrawn and both Husband and Mother testified credibly of their reconciliation.

Even if the Uniform Act on Blood Test could be applied to the present situation, this court did find that the Supreme Court's direction in K.E.M. requires it. The cases are factually distinguishable. In K.E.M. the mother filed a complaint for support against the putative biological father. The question before the court then was who should support the child: the

6

mother's husband, who had provided financially for the child while the parties were in a relationship but from whom the mother was separated; or the biological father? The instant matter is not at all similar. Even when Mother and Husband were separated, there was never any question that Husband would continue to support the Child and be the father he had always been. Petitioner's attempt to intervene in this matter raises entirely different questions than were before the Supreme Court when it decided K.E.M.

Instead, this case is similar to that of Buccieri v. Campagna. In Buccieri, the mother and father had only a brief relationship, after which she informed him she was pregnant. The mother never sought support from the father and he did not seek to establish paternity. Indeed, he did not see the child until three or four years after birth, and then only in passing. Even after this chance meeting, the father did not seek to establish any relationship with the child for another three or four years. The Superior Court denied the putative father's request for genetic testing on the grounds that he was estopped from making a paternity claim because he was on notice that the child may be his yet failed to pursue the claim for seven years. Buccieri v. Campagna, 889 A.2d 1220 (Pa. Super. 2005). This instant appeal is factually similar in that Petitioner knew he was a potential father prior to or shortly after the Child's birth—he visited Mother in the hospital and held the Child—but he did nothing to pursue conformation of paternity for nearly six years.

In applying the doctrine of paternity by estoppel to the facts of this case, this court finds particularly instructive the dissent authored by Justice Baer in K.E.M. Justice Baer, joined by Justice McCaffery, objected to the majority opinion not because it stripped away much the substance of the doctrine of paternity by estoppel, but because it did not go far enough. Justice Baer wrote: "I would abrogate the doctrine in its entirety, with the limited exception of where its invocation would preserve the status of a husband who chooses to parent a non-biological child born into an existing marriage." K.E.M., 38 A.3d at 814. This, of course, is nearly the precise

7

situation faced by this court, the only difference being the Child was born prior to the marriage. Husband has chosen be a father in every way to the Child to whom he bears no blood relationship. He wishes to continue that relationship, and wished to do so even prior to his reconciliation with Mother. Whatever the extent of the Supreme Court's decision in K.E.M., the doctrine of paternity by estoppel survives in sufficient strength to protect husband's relationship with the Child, especially in light of Petitioner's failure to act until this moment.

B. The court erred in not considering the fraud on the part of Mother.

The court did not consider fraud on the part of Mother because, quite simply, the court did not find that Mother had committed fraud. "The traditional test for fraud is: (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result." Glover v. Severino, 946 A.2d 710, 713 (Pa. Super. 2008) citing N.C. v. M.H., 923 A.2d 499, 503 (Pa. Super. 2007). "Fraud is practiced when deception of another to his damage is brought about by a misrepresentation of fact **or by silence when good faith required expression.**" In re Adoption of R.J.S., 889 A.2d 92, 98 (Pa. Super. 2005) (emphasis in original). Petitioner testified that that he wanted a paternity test at the time of the Child's birth, but Mother declined (N.T., p. 11). He also asks the court to believe he had no indication—none—that he was the Child's father before November 2017 (Id. p. 25). Despite the fact that he was in a sexual relationship with Mother nine months prior to the Child's birth and visited Mother with the express intention of seeing if the Child looked like him (Id. p. 11). The court did not find Petitioner's testimony credible. Instead, the court found credible Mother's testimony that she asked Petitioner to undergo a paternity test shortly after the Child's birth and he refused. Furthermore, Petitioner failed to introduce at the hearing any other credible evidence that Mother hid his relationship to the Child from him that would explain his nearly six years of

8

disinterest in the Child. Mother telling Petitioner that she was going to live with another man and this man would take care of her and the Child is simply not a misrepresentation of the Child's parentage on Mother's part. Nothing prevented Petitioner from insisting on a paternity determination at that time—except perhaps his own reticence at being required to make support payment (Id., p. 30). Mother had no knowledge of who the Child's biological father was among the men she had a relationship with during the time of the Child's conception. She did not, either through statement or silence, hide the Petitioner's potential parentage from him. She did not commit fraud.

C. The court erred in its consideration of the best interests of the Child.

As discussed in Section IV.A, supra, the doctrine of paternity by estoppel must now be considered as it relates to the Child's best interests. Petitioner argues that this court failed to consider the contributions he is willing to make on behalf of the Child and the interest of the Child in knowing her biological father (if he were to prove to be her biological father). This is incorrect. The court heard Petitioner's testimony and considered it. However, it also considered the testimony of Husband and Mother. Husband has been the Child's father since she was six months old. He has cared for her financially, practically, and emotionally. He treats her the same as he does his biological children with Mother. He signed a support order with the Office of Domestic Relations during the separation and even attempted to have his name listed on her birth certificate—both events occurring prior to Petitioner's attempt to intervene. In short, Husband has fulfilled the role of father to the Child completely, and he wishes to continue doing so. Against this mass of evidence, Petitioner's vague statements regarding contributions and support carry little weight. Further, Husband is the only father the Child has ever known. "[C]hildren should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma

9

that may come from being told that the father [she] has known all [her] life is not in fact [her] father. Fish v. Behers, 741 A.2d 721, 724 quoting Brinkley v. King, 701 A.2d 176, 180 (Pa. 1997).

## V.   CONCLUSION

For all the reasons given above, this court did not commit an error of law or an abuse of discretion in denying Petitioner's request for genetic testing. The court's order dated May 7, 2018, should be upheld.

BY THE COURT:

_____
JEFFREY A. CONRAD, JUDGE

ATTEST: _____

COPIES TO:   Julie Miller, Esq.
             Beulah Mall, Esq.
             Paula Katchmer, Esq.

10